[Civ. No. 12598. First Dist., Div. One. May 15, 1944.]

BESSIE LAHERTY et al., Respondents, v. JOSEPH J. CONNELL et al., Appellants.

356

Lloyd J. Cosgrove for Appellants.

Joseph F. Leonard for Respondents.

PETERS, P. J.—Bessie Laherty, Mary Dalpino and William Connell, three of the children of James Connell, brought this action against their brother, Joseph J. Connell, and his wife, alleging that two deeds executed by James Connell shortly before his death, and naming defendants as grantees, had been executed as a result of the undue influence of defendants and while the grantor was mentally incompetent. The trial court entered judgment setting aside the deeds and restoring the real property involved to the estate of the grantor. Defendants appeal, urging that the evidence is insufficient to support the findings, and that, in any event, the relief granted by the judgment is in excess of the relief to which plaintiffs are rightfully entitled.

■ The appellants, by emphasizing the evidence produced by them, and by discounting or disregarding some of the evidence produced by respondents, make a quite persuasive showing that the evidence is insufficient, as a matter of law, to support the findings. In order to prevail on this ground, the appellants must demonstrate that there is no material, credible evidence or no reasonable inference from the evidence to support the challenged findings. As was stated in the frequently cited case of *Crawford* v. *Southern Pacific Co.,* 3 Cal.2d 427, 429 [45 P.2d 183] : ''. . . the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted'' that supports the findings, and that when ''two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.'' (See, also, *Albaugh* v. *Mt. Shasta Power Corp.,* 9 Cal.2d 751 [73 P.2d 217] ; *Bellon* v. *Silver Gate Theatres, Inc.,* 4 Cal.2d 1 [47 P.2d 462] ; *Raggio* v. *Mallory,* 10 Cal.2d 723 [76 P.2d 660] ; *Estate of Bristol,* 23 Cal.2d 221 [143 P.2d 689].)

■ Keeping these fundamental rules in mind, and resolving all material conflicts in favor of respondents, the evidence most favorable to them shows the following: The deeds of gift by which the two parcels of realty were conveyed to appellants, and by which, after the death of the grantor, it was discovered he had thus conveyed away his entire estate, were executed on October 30, 1941. At that time the grantor was eighty-two years of age, and was suffering from an advanced incurable cancer of the bladder, from which he died on November 16, 1941.

For the major portion of ten years prior to his death James Connell lived with one or the other of his children. His wife had died in 1931. From July, 1931, to May, 1940, except for a two-year period when he lived alone, he stayed with his daughter, the respondent Bessie Laherty. In 1940, because his failing health required more care than Mrs. Laherty could give him, Connell went to live with his other daughter, Mary Dalpino, with whom he lived until October 29, 1941. On that day Joseph Connell removed his father to his home. He remained with Joseph until November 10, 1941, when he was taken to the hospital, where he died six days later.

Prior to his removal to the home of Joseph, the father was friendly toward all four of his children. To them and others he frequently expressed an intention to leave all his property to them share and share alike. He not only expressed this intent but took active steps to carry it out. In 1938, he drafted a will leaving everything of which he died possessed equally to the four children. This will was unrevoked at the time of his death, and has been admitted to probate. In 1939 he sold a piece of property for which he received a substantial sum in cash. He divided nearly all of the proceeds among his four children. Although there is some evidence that the division was not exactly equal, the evidence shows that at that time each of the children received about $1,600. He had joint tenancy bank accounts with Joseph, Mary and Bessie in varying amounts, but he equalized this with William by selling him a piece of property for less than its actual value.

Until about May of 1941, James Connell, considering his age, was in reasonably good health and mentally alert. About May, or shortly thereafter, he began to require constant medcial care. His condition grew progressively worse. Bessie Laherty testified that after her father left her home to live with Mary, she saw him almost daily; that on several occasions she had heard appellant, Joseph Connell, attempt to undermine his brother William in the affections of James Connell; that starting about May, 1941, her father became quite ill and grew progressively worse; that he became very feeble and could not walk without assistance; that his hearing was very bad; that he had to be assisted to the bathroom; that he wouldn't talk very much; that his memory "wasn't so good"; that appellant Joseph Connell, for the six months' period prior to his father's death, attempted to handle and direct his father; that by October 29, 1941, when Joseph removed his father to his home, the father's condition was "very bad"; that she didn't see her father during the few days he stayed with Joseph, but that she did see him daily after he entered the hospital; that during that period he was under the influence of opiates; that while in the hospital her father was too sick to engage in conversation.

A friend of the family, Anthony Malarkey, testified that he saw the deceased frequently during the last six months of his life; that he was a "very sick man"; that he had to be helped to bed; that he only spoke a few words.

Jack Dalpino, husband of Mary Dalpino, testified that

about six weeks before his death James Connell became very sick and weak; that for two months before James was removed to the home of Joseph the doctor would call every day, and sometimes twice daily; that while James was staying with the Dalpinos Joseph would sometimes tell his sister Mary to go out of the room so that he, Joseph, could be alone with his father; that his wife, Mary, had to feed, bathe and put her father to bed; that the day before Joseph took his father away from the Dalpino home Joseph and Mary got into an argument over the fact that James gave Joseph $150; that at that time James was so sick "he didn't know at that time whether he was coming or going."

William Connell testified that his father frequently stated to him and the other children that "if anything happened to him he wanted it [his property] divided equally" among the children; that in 1938, at his father's request, he took him to a notary public who drafted a will for him. He also testified that he took his father to the hospital on November 10, 1941; that on that day he was "a very, very sick man"; that he couldn't walk or talk or sit upright in the car.

Mary Dalpino corroborated her sister Bessie as to most of her testimony. She also testified that about May, 1941, her father began to pass blood in his urine and grew progressively worse; that Joseph would visit James at her house and order her out of the room in order to be left alone with their father; that in her presence Joseph would frequently disparage brother William to their father by accusing William and his wife of being spendthrifts; that her father frequently stated he wanted his property to be divided equally among the children; that by September, 1941, her father's condition was so bad that he no longer attended church which he used to do daily; that by October he was so ill he couldn't read his own writing and was weeping continuously; that by that time his mental condition was failing; that the night before her father left her home she and Joseph got into a dispute over $150 that James gave Joseph; that the next morning (October 29, 1941) Joseph arrived at her home at 6:15 a. m. and shaved her father and started to remove his clothes from the house; that she begged her father not to leave and Joseph threatened her with bodily harm if she interfered; that her father paid no attention to her; that he acted "just like he was in a stupor"; that Joseph had to assist the old man down

the stairs; that she next saw him in the hospital; that he was then in a "terrible condition" and grew worse until his death.

The hospital record shows the following entries made upon entrance to the hospital: "Examination unsatisfactory because of lack of cooperation . . . senility."

As opposed to this testimony, Joseph testified that while his father was at his home he was quite active; that he walked around the house unassisted and dressed and bathed himself; that his father asked to come to live with him because Mary had protested over the fact that the father had given Joseph $150; that on the morning of October 30, 1941, his father gave him two deeds containing descriptions of the properties here in question, and told Joseph to have deeds to the property made out in his and his wife's names; that he protested, but his father told him he wanted him to have the properties; that the father's health and physical condition was then "very good," and his "mental condition was perfect"; that for some years he had acted as his father's business advisor and associate, and counseled and advised him, but his father acted on his own judgment; that he didn't suggest to his father that he should get a lawyer; that he took the two old deeds to a notary public whom he knew and who had an office on his "beat" (Joseph was a police officer); that he told the notary to make out the deeds and to bring them out to the house because his father was unable to come in; that he paid nothing of value for the properties; that he brought the notary out to the house and was present while the notary supervised their execution; that his father read them and the notary asked him if that was his wish, and his father replied affirmatively; that the notary handed the signed deeds, after acknowledging the signature, to his father and his father handed them to him stating "I want you and your wife to have this property."

The notary corroborated Joseph in most respects, and testified that James, Joseph and Joseph's wife were present while the deal was consummated. Joseph's wife, although a party to this proceeding, was not called as a witness to explain what took place at the time of the execution of the deeds, nor was her absence explained. The notary further testified that the old man seemed to know what he was doing, and looked in good health.

Several of the attending physicians were called. They dis-

closed that James was suffering from an extensive and incurable cancer of the bladder. They gave it as their opinion that around the time of the execution of the deeds, considering the age of James, he was essentially normal and was mentally sound.

On this testimony the trial court found that "on October 30, 1941, decedent James Connell was of the age of approximately eighty-two (82) years; that he was suffering from incurable cancer and in a weak and debilitated condition as a result of the ravages of said disease; that while in such condition he was in a condition, both mental and physical, to be easily influenced and imposed upon by designing and artful persons, and in particular, those in whom he reposed trust and confidence; that he was unable to realize the objects of his bounty, the nature and extent of his property, and to properly care for the same"; that Joseph "was a man of strong and aggressive disposition and of a dominating and controlling nature and personality"; that Joseph removed decedent to his home against the will of decedent; that "defendants, after getting decedent into their home, gained and exerted such an influence over him so as to render him submissive and subject to their will and desires, and they were enabled to and did persuade decedent to transfer said property by said alleged deeds, contrary to the will and wish of said decedent"; that the defendants secured the conveyances "by the use of undue influence over him and by an abuse of the confidence reposed in them by decedent and by the real and apparent authority and control exerted over decedent by them and the fiduciary relationship existing between decedent and his son, Joseph Connell and thereby imposed upon and obtained an unfair advantage over decedent"; that the execution of the deeds was "not the free and voluntary act of decedent," but that such execution "was caused and procured by and through the unfair advantage taken of decedent by defendants and the undue influence exerted over decedent by defendants and by and through an abuse of the trust and confidence reposed by decedent in said Joseph Connell and the unlawful authority exercised over the will and mind of decedent by defendants"; that when the deeds were executed "decedent was not of sufficient mental or physical strength to resist the influence, pressure and importunity exercised over him by defendants" and the deeds were secured

without consideration and without decedent having any independent advice. The court also found that on October 30, 1941, James Connell was "mentally incapacitated from executing said documents."

The above summarized evidence, and the reasonable inferences therefrom, support these findings. The evidence shows a man of advanced age suffering from an incurable disease that was sapping his strength. He was physically and mentally in a condition so that undue influence could undoubtedly be exercised, particularly by a son who for years had counseled and advised him. The trial court was justified in finding, if in truth it was not compelled to find, that a confidential relationship existed between Joseph and his father. (*Hatch* v. *Penzner,* 44 Cal.App.2d 874 [113 P.2d 295]; *Cooney* v. *Glynn,* 157 Cal. 583 [108 P. 506]; *Lauricella* v. *Lauricella,* 161 Cal. 61 [118 P. 430]; *Campbell* v. *Genshlea,* 180 Cal. 213 [180 P. 336]; *Mead* v. *Mead,* 41 Cal.App. 280 [182 P. 761]; *Forman* v. *Goldberg,* 42 Cal.App.2d 308 [108 P.2d 983]; *Steinberger* v. *Steinberger,* 60 Cal.App.2d 116 [140 P.2d 31].) This throws on the beneficiary of the transaction the burden of showing fairness in the transaction. (*Campbell* v. *Genshlea, supra; Nobles* v. *Hutton,* 7 Cal.App. 14 [93 P. 289]; *Piercy* v. *Piercy,* 18 Cal.App. 751 [124 P. 561]; *Payne* v. *Payne,* 12 Cal.App. 251 [107 P. 148]; *Myrick* v. *Bruetsch,* 13 Cal.App.2d 219 [56 P.2d 591].) The fact that there was no independent legal advice is of some importance. (*Nobles* v. *Hutton, supra; Myrick* v. *Bruetsch, supra; Fowler* v. *Enriquez,* 56 Cal.App. 107 [204 P. 854].)

Appellants cite a number of cases holding that the question of whether or not the grantor had independent legal advice is immaterial when the deed is made freely, voluntarily and with a full understanding of all the pertinent facts. (*Wilbur* v. *Wilbur,* 197 Cal. 1 [239 P. 332]; *Soberanes* v. *Soberanes,* 97 Cal. 140 [31 P. 910, 17 L.R.A. 301]; *Creason* v. *Creason,* 123 Cal.App. 455 [11 P.2d 451]; *Best* v. *Paul,* 101 Cal.App. 497 [281 P. 1089]; *Walker* v. *Smith,* 58 Cal. App. 145 [208 P. 157]; *Broaddus* v. *James,* 13 Cal.App. 464 [110 P. 158].) Those cases undoubtedly state the law correctly. The point is that in all six cases the trier of the facts had expressly or impliedly found that the deeds there involved had been executed freely, voluntarily, and with a full understanding of all the facts. In each case the court held

that the evidence supported this finding and affirmed the judgments for defendants. The lack of independent advice, even where there is a confidential relationship, does not conclusively establish fraud and undue influence. But here the trial court found, and the finding is based on the evidence and reasonable inferences therefrom, that the deeds were not executed freely, voluntarily and with a full understanding of all the facts. In such event, the lack of independent advice, when coupled with the existence of the confidential relationship, the age of the grantor, his physical and mental condition, under the cases above cited, raised a presumption of fraud and undue influence sufficient to cast the burden on the grantees. Appellants contend that they sustained the burden by the testimony of Joseph Connell and the notary. The trial judge was not required to believe, and, as his findings indicate, did not believe these witnesses. Their credibility was for the trial judge. (*Security-First Nat. Bank* v. *Bruder*, 44 Cal.App.2d 767 [113 P.2d 3].) The respondents could not prove what happened when the deeds were executed. But they did prove the facts that threw the burden upon appellants to explain and justify the transaction. Whether they satisfied that burden was a question exclusively for the trial court.

Appellants also contend that the judgment is too broad. The judgment sets aside, cancels and annuls the deeds which form the basis of appellants' claims, and then states "that the claims of said defendants, and each of them, and all who claim title under them or either of them, in and to either or both of said parcels of real property are without any right whatsoever, and defendants have no right, title or interest in, upon or to said parcels of real property; that the title to said parcels of real property was vested in James Connell at the time of his death and defendants and all persons claiming under them are debarred and enjoined from claiming or asserting any estate, right, title or interest in said parcels of real property under or by virtue of said two purported deeds." The appellants express the fear that the portion of the judgment first above quoted is so broad as to prevent them from claiming their one-fourth interest in the property by reason of the provisions of the will of James Connell. The judgment cannot reasonably be so interpreted. When read as a whole it simply cancelled and annulled the

364

two deeds, and decreed that appellants have no claim or right to the property by virtue of these deeds. It then recited that the properties were vested in James Connell at the time of his death and enjoined all persons claiming under or through the deeds from claiming any title or interest under the deeds. It is obvious, and respondents so concede, that any claim that Joseph Connell may have as a legatee or heir of his father is not affected by the judgment.

The judgment appealed from is affirmed.

Knight, J., and Ward, J., concurred.