[Civ. No. 13101. First Dist., Div. One. Oct. 3, 1946.]

VINCENCIA AZEVEDO, as Administratrix, etc., Appellant, v. DOROTHY M. LEAVITT, as Administratrix, etc., Respondent.

Frank S. Roderick, Augustin Donovan and Louis B. De-Avila for Appellant.

Myron Harris, William H. Older and John Jewett Earle for Respondent.

SCHOTTKY, J. pro tem.—Appellant, as administratrix of the estate of her father, commenced an action to set aside certain transfers by gift made by decedent to Christina Thorndike, another daughter. The property involved consists of two parcels of real property and a bank account. The validity of the transaction is attacked in four causes of action, predicated respectively upon the grounds of (1) fraud; (2) undue influence; (3) unsoundness of mind; and (4) lack of proper execution. The trial court found in favor of defendant upon all four causes of action, and this appeal is from the judgment entered in accordance with said findings. After the trial of the action defendant Christina Thorndike died, and the administratrix of her estate has been substituted as respondent upon this appeal.

Appellant has expressly abandoned the grounds of unsoundness of mind and improper execution of the two deeds, so that the only issues before us on this appeal relate to the first and second causes of action, namely, fraud and undue influence.

Appellant's basic contention, urged with great earnestness in her brief and upon the oral argument, is that the evidence was such as to indicate that both fraud and undue influence had been presumptively established, and that the burden was then upon defendant to go foward with proof sufficient to show fairness and lack of undue influence. Appellant contends that respondent has failed to sustain that burden.

Before proceeding to discuss appellant's contentions as to the insufficiency of the evidence we deem it proper to review briefly the general principles applicable to such cases.

It is stated in 20 California Jurisprudence at page 445: ''In one case the supreme court observed: 'Where the parent is of great age, or is enfeebled by disease, and conveys his entire estate to one child, to the exclusion of other children dependent upon his bounty, the burden is unquestionably upon the donee to show that the gift was made freely and voluntarily, and with full knowledge of all the facts, and with perfect understanding of the effect of the transfer.' The rule is the same where the disposition of the parent's property is shown to have been effected, not by a transaction inter vivos, but by last will and testament. In its operation this presumption requires the beneficiary to assume the burden of showing that the donor acted voluntarily; and, if he fails to establish facts from which volition may be inferred, the transaction will be held to be void.''

In *Soberanes* v. *Soberanes,* 97 Cal. 140, at page 145 [31 P. 910, 17 L.R.A. 301], the court said: "There is no doubt as to the principle applicable to cases of this kind. Transactions like the one under consideration are watched by courts of equity with the most scrutinizing jealousy, and are generally held to be presumptively void. They will be set aside upon the discovery of the least fraud, and every presumption ought to be indulged against them. The person who makes the donation and bestows the confidence is not bound to show that any imposition has been practiced upon him. It is sufficient for him to establish intimate and confidential relations with the donee. Some of the cases hold that undue influence is not to be inferred from the relation of parent and child, where the gift is from the parent to the child (*Millican* v. *Millican,* 24 Tex. 446); but where the parent is of great age, or is enfeebled by disease, and conveys his entire estate to one child, to the exclusion of other children dependent upon his bounty, the burden is unquestionably upon the donee to show that the gift was made freely and voluntarily, and with full knowledge of all the facts, and with perfect understanding of the effect of the transfer. (*Todd* v. *Grove,* 33 Md. 194; *Highberger* v. *Stiffler,* 21 Md. 352; 83 Am.Dec. 593.)''

And in *Campbell* v. *Genshlea,* 180 Cal. 213, the court said at page 224 [180 P. 336] : "It is to be remembered that in a case involving a purported gift *inter vivos,* based upon an alleged consideration of love and affection, where the donee is a daughter having the control and direction of the aged donor, a strong presumption of confidential relation arises which would place upon the beneficiary in the transaction the burden of showing fairness in dealing and full understanding on the part of the person parting with the property. (*Nobles* v. *Hutton,* 7 Cal.App. 14 [93 P. 289].)''

In the *Estate of Hansen,* 38 Cal.App.2d 99 [100 P.2d 776], in which case a hearing was denied, the court said at page 116 : "It is true the authorities hold that the establishment of a presumption does not have the effect of shifting the burden of proof from the party upon whom the affirmative of an issue rests. (*Scarborough* v. *Urgo,* 191 Cal. 341 [216 P. 584]; *Valente* v. *Sierra Ry. Co.,* 151 Cal. 534 [91 P. 481]; *Estate of Eakle,* 33 Cal.App.2d 379 [91 P.2d 954]; 10 Cal.Jur. 783, sec. 88; 68 C.J. 755, sec. 449.]) But when a presumption of undue influence is raised by showing the existence of a confidential relationship, coupled with activity on the part of

the proponent of a will, a *prima facie* showing of undue influence is thereby established which, in the absence of evidence to the contrary, necessarily has the effect of invalidating the will because it is then not the result of the free will or volition of the testator. It logically follows that the presumption necessarily results in invalidating the will on that account. Under such circumstances, the presumption becomes controlling. To overcome that *prima facie* showing it becomes necessary for the proponent to rebut the presumption by evidence which, at least, will have the effect of balancing the *prima facie* showing. . . ." (See, also, *Jorgensen* v. *Dahlstrom,* 53 Cal. App.2d 322 [127 P.2d 551].)

From the foregoing authorities we believe that the rule may be stated to be that where, as in the instant case, a confidential relation exists between an aged father and a daughter, and the father conveys his property without consideration to said daughter to the exclusion of his other children, a presumption of fraud and undue influence arises, and the burden is then upon the donee to go forward and establish that the transaction was fair and free from fraud or undue influence.

The donee must rebut the presumption by evidence which is sufficient to overcome it, and whether the donee has overcome the presumption is a question exclusively for the trial court. Before an appellate tribunal would be justified in reversing the finding of the trial court that there was no unfairness, fraud, or undue influence on the part of the donee, it must appear that there is no substantial evidence to support such finding. As this court said in *Laherty* v. *Connell,* 64 Cal.App.2d 355, at page 357 [148 P.2d 895]: "In order to prevail on this ground, the appellants must demonstrate that there is no material, credible evidence or no reasonable inference from the evidence to support the challenged findings. As was stated in the frequently cited case of *Crawford* v. *Southern Pacific Co.,* 3 Cal.2d 427, 429 [45 P.2d 183]: '. . . the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted' that supports the findings, and that when 'two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' (See, also, *Albaugh* v. *Mt. Shasta Power Corp.,* 9 Cal.2d 751 [73 P.2d 217]; *Bellon* v. *Silver Gate Theatres, Inc.,* 4 Cal.2d 1 [47 P.2d 462]; *Raggio* v. *Mallory,* 10 Cal.2d 723 [76 P.2d 660]; *Estate of Bristol,* 23 Cal.2d 221 [143 P.2d 689].)"

With these fundamental principles in mind, we shall give a brief review of the evidence.

On February 2, 1942, the date of the execution of the deeds and the establishing of the joint bank account, decedent, Francisco R. Camacho, was 86 years old and had two daughters beside appellant administratrix and defendant Christina Thorndike. He died on March 1, 1942, at a hospital in Oakland. During December, 1941, and January and February, 1942, decedent was living with defendant at her home in Mill Valley. During the period from December 22, 1941, to January 10, 1942, decedent had to leave defendant's home on two occasions for hospitalization. It also appears that decedent lived with defendant some time during November, 1941, and that he had to go to the hospital "around Thanksgiving."

Defendant testified that her father "had confidence" in her, and "toward the last" he did not have confidence in her other sisters "at all." She also testified that she had told her father—apparently both before and at or about the time of the transfers—that she would "take care of him always," but she likewise said that she would take care of her father if he "wouldn't leave me a red cent." She testified that she believed her father was always of sound mind and that he was always "a very determined man, he had a mind of his own."

Several days prior to February 2, 1942, decedent and defendant went to the law offices of Silverstein & Silverstein, in Oakland; and, as defendant testified, her father told his attorney, Bernard Silverstein, that he wanted to deed his property to defendant as the "others did not care for him at all." Defendant said that her father never talked to her about what he was going to do with his property until he took her to Silverstein's office. She said that the lawyer told her father that if he deeded his property to defendant she would then own it and he would get the rents during his life, but could not mortgage or sell the property.

The first visit occurred on a Friday, and Silverstein had defendant and her father return the following Monday (February 2, 1942) at which time the deeds were executed. Before the deeds were executed, Silverstein, together with decedent and defendant, went to the bank and had decedent's account changed to the joint account herein concerned. After all the transfers had been concluded, decedent and defendant returned to defendant's home in Mill Valley. During her

examination by plaintiff under Code of Civil Procedure section 2055, defendant implicitly denied that her father finally departed her home through any fault or compulsion on her part. In this respect, she said that her father was going to Oakland to collect the rent on his property ("toward the end" of February, 1942), and that she accompanied him as far as San Francisco. He then sent her back to Mill Valley, he saying, "Now, don't treat me like a baby because I am capable of taking care of my own affairs." She then went home and, while he was in Oakland, he had a stroke—as a result of which he was taken to the hospital in Oakland. It was while in the hospital (and without ever returning to defendant's home) that the father died.

Plaintiff's witness, Caroline A. Marithew, testified that she had been a neighbor of decedent for more than 15 years prior to his death, and that she knew him very well. She thought that during the last six months prior to his death he was of unsound mind. She said he was forgetful—even to forgetting where he lived. She last saw him about February 25, 1942, when he came to her home in Oakland, the day that he had the stroke. The witness was then asked as to what conversation she had had with decedent on that day, and upon objection being made that such conversation was inadmissible as to the first and second counts (fraud and undue influence), the witness was permitted to answer, but the court limited it solely to the issue of undue influence. Counsel for appellant indicated agreement with the position of defendant and the court that the conversation with decedent was to be limited to the undue influence issue. Mrs. Marithew testified that on that day decedent told her that he was going to "change" some papers he had made out to his daughter "in regard to the property." Defendant then moved to strike that testimony, and the court stated, "It may be limited only to the ground of undue influence." She also testified that decedent told her that "his daughter had thrown him out," and "he was going down to Oakland to see about that paper in regards to the property." On cross-examination Mrs. Marithew said that decedent knew his four daughters, knew his properties and was a very frugal man. She also said that decedent was "at times" a man of considerable determination.

Plaintiff's witness, May Victor, testified that she had known decedent since 1927 and that she knew him "pretty well." She thought there was something the matter with decedent's

head the last few months of his life. She said she had seen decedent strike himself on the head and say, "I am crazy, I don't know what I'm doing." She also said decedent wanted to deed her a home, but that she did not want it. She said that in early December, 1941, decedent told her that he would not "leave anything to Mrs. Thorndike" because she had borrowed $800 from him and failed to return it. (It appears that the witness had housed and cared for decedent in her own home during a several day illness in early December, 1941.) Mrs. Victor testified that on February 15, 1942, decedent told her that he had deeded his property to defendant because she had promised to care for him "as long as he lived." The record shows that the court admitted her testimony of that alleged conversation "limited though to the single ground of undue influence."

After a similar objection by defendant, and an identical ruling by the court—i. e., limiting the testimony to the sole issue of undue influence—Mrs Victor testified that on February 25, 1942, decedent came to her house in Oakland and told her that "his daughter forced him to give the property to her" and "after she had the deed in her hands she start to treat the father awful mean," that she told him to "get out of the home and stay out." The witness also testified that decedent told her that he was going to see Silverstein "to have that changed all around." He wanted the witness to go with him, but she would not—and she testified "that's the last I see the old man."

Plaintiff testified that while decedent was still living in Oakland he asked her why defendant never came to visit him. She said that they took decedent from the hospital to defendant's home on December 11, 1941. She also said that on January 28, 1942, her father told her that he was "going home," and that he "wasn't happy" in defendant's home— that he "was neglected and he wasn't getting the attention that he should."

On cross-examination, plaintiff testified that she had never taken care of her father because she had been a "very sick woman" since 1938, although he had lived with her for three years after her mother's death in 1917. She also said that in 1938 defendant suggested to her that they have their father declared incompetent.

Defendant's only witness was Bernard Silverstein, the at-

torney who interviewed decedent concerning the transfers and then arranged the necessary papers. The witness had apparently handled legal matters for decedent since 1919 or 1920. He testified that he prepared the February 2, 1942, deeds for decedent; and said that several days prior to that date decedent, together with defendant, came to his office without prior appointment. Decedent told him that he wanted to deed his properties to defendant, and wanted to ''put her name on his bank account.'' Decedent told the witness that he desired to do such because defendant ''has no husband to take care of her, and the others all have husbands, and I want to give the property to her.'' Silverstein told decedent that he would need certain ''papers'' and told decedent to bring them to him and they could ''talk it over some more.''

Decedent and defendant returned on February 2, 1942, with the original deeds, insurance policies, title insurance policies and his bank book—and also a will and codicil which Silverstein had previously drawn for him. Silverstein then explained to decedent what would be the result of the transfers, and decedent signified that he understood. He then sent defendant and decedent to the bank to effect the transfer of the bank account, and, after Silverstein dictated the terms of the deeds to his secretary, he went to the bank to meet them. At the bank, Silverstein requested the bank's Portuguese interpreter to explain to decedent the import of the account transfer and the deeds, and decedent indicated his understanding and approval. They then went back to Silverstein's office and the deeds were executed and acknowledged. Decedent then handed Silverstein the will and codicil, asking that he destroy them; but, after Silverstein said that he did not want to ''tear up other people's papers,'' decedent tore up the will and codicil. At decedent's solicitation, Silverstein recorded the two deeds a few days later. Silverstein thought that on February 2, 1942, decedent was of sound and disposing mind, knew his property and the extent thereof, and knew his children. He also testified that at a previous consultation had between him and decedent's daughters (apparently a considerable time before 1942), plaintiff and another of the sisters refused to take decedent into their homes to care for him, and the defendant said that she would take him. At the time the transfer of the bank account was made, decedent told Silverstein that he ''trusted'' defendant.

It is clear from the evidence that a confidential rela-

tion existed between decedent and defendant and that decedent transferred all of his property to her. Therefore, under the authorities hereinbefore set forth it became the duty of defendant grantee to "go forward" with evidence to show that the transaction was fair and free from fraud or undue influence. However, the conclusions reached by the trial court should not be disturbed unless there is no substantial evidence to support those conclusions. As was said by this court in *Laherty* v. *Connell, supra,* at page 363: ". . . they did prove the facts that threw the burden upon appellants [donees] to explain and justify the transaction. *Whether they satisfied that burden was a question exclusively for the trial court."* (Emphasis added.)

Appellant contends most earnestly that defendant donee has not satisfied that burden, and by emphasizing the evidence produced by her and by discounting or disregarding some of the evidence produced by defendant, makes a quite persuasive argument that the evidence is insufficient as a matter of law to support the findings. However, the evidence in this case, as hereinbefore summarized, shows clearly that there is ample evidence in this case to justify the findings of the trial court that the transaction was free from fraud or undue influence. For an appellate tribunal to say, upon the record here, that the learned trial judge was not justified in holding that the presumption of fraud and undue influence was overcome by defendant, would, in our opinion, be a usurpation of the legitimate function of the trial court. The trial judge was no doubt satisfied that the decedent was fully aware of the nature and effect of the transaction, that he wished defendant to have his property, that there was no fraud on the part of defendant and that there was no undue influence exerted upon decedent. These were all matters that it was the exclusive province of the trial court to decide, and there is ample evidence in the record to support the conclusion reached by the trial court.

In view of the foregoing the judgment is affirmed.

Peters, P. J., and Ward, J., concurred.