[Civ. No. 13988.   First Dist., Div. One.   June 10, 1949.]

MARIE GONSALVES, Appellant, v. JOSEPH GON-
SALVES, Respondent.

Edmund J. Holl and George H. Sullivan for Appellant.

Edward A. Cunha and Dean Cunha for Respondent.

BRAY, J.—Plaintiff in a divorce action appealed from those portions of an interlocutory decree of divorce which awarded her only 60 per cent of the community property. The sole question involved is whether the trial court abused its discretion in granting plaintiff, to whom it awarded a divorce on the ground of extreme cruelty, *only* 60 per cent of the community property.

## PLEADINGS

Plaintiff wife brought an action against defendant husband on the ground of extreme cruelty, alleging that the sole community property consisted of approximately $900 in the bank. In the second and third causes of action she claimed title to all other property standing of record in the joint names, as separate property. There was a fourth cause of action, which was not pressed, and will be disregarded. Defendant answered, denying the acts of cruelty and claiming that the property described in the second and third causes of action, as well as additional property, was community property, and asked for a division thereof. Defendant also cross-complained for divorce, on the ground of cruelty. At the trial, however, defendant withdrew his cross-complaint and did not contest the cause of action for divorce. The issue as to the character of the property and its division was hotly contested. The court found that all of the property of the parties, including that claimed by plaintiff as her separate property, was community property. No attack is made on this finding. The court then decreed that it be awarded 60 per cent to plaintiff and 40 per cent to defendant.

The acts of cruelty proved at the trial were not particularly aggravated ones. The reporter's transcript contains 430 pages, all but seven of which are devoted to the property situation. There were 38 exhibits relating to the same subject.

## PLAINTIFF'S CONTENTION

Plaintiff contends that the trial court abused its discretion in not awarding a larger percentage of the property to her, and asks this court, under section 148 of the Civil Code, to revise the award. This contention is based primarily upon the claim that the evidence proves that plaintiff brought to the marriage (its date was Nov. 7, 1942) the sum of $10,800, kept in a safe deposit box, and a profitable dress shop business; that defendant was an unemployed and penniless fisherman who brought nothing of financial value to the marriage; that during the marriage he did not work, but loafed around

the business, which she alone built to a point where it was sold for a net sum of $23,750; that the latter sum, together with proceeds from the operation of the store, and the safe deposit box money, made up the purchase price of the properties which the parties had at the time of the divorce. If the court had found in accordance with this claim, then, probably, the court should have awarded plaintiff more than 60 per cent of the property which her money and efforts had accumulated. But, while the plaintiff's evidence, if believed, would support this claim, there was substantial evidence to the contrary, which showed that plaintiff did not have the money in the safe deposit box which she claimed to have, and that while she did have a dress shop, its value was about the same as the money which defendant brought into the community; that after the marriage defendant worked as diligently as plaintiff in building the dress shop business, and that the property of the parties was the fruit of their joint efforts, and that in view of the fact that the cruelty proved was not of any aggravated type, a grant to plaintiff of only 10 per cent over her half of the community property was, under the circumstances, fair to plaintiff and far from an abuse of discretion by the court.

EVIDENCE

It is not necessary to detail the evidence in the case. It will be sufficient to point out that there is substantial evidence to support the implied finding of the court that plaintiff's history of the financial situation of the parties is not true.

THE FINANCES AT THE TIME OF MARRIAGE

Plaintiff then (Nov. 7, 1942) owned a ladies' ready-to-wear shop at 1937 Post Street. She testified that the store fixtures were worth about $3,000 and the merchandise about $2,000 or $3,000. The record does not show what the debts of the business were. Plaintiff, in September, 1938, had been adjudicated a voluntary bankrupt. Defendant testified that plaintiff had told him she had intended taking in a partner who was to pay her $1,000 for a half interest. Plaintiff testified that in connection with the business she maintained a commercial account in a certain bank of "a few hundred dollars or so." An employee of this bank testified that there was no such account. Plaintiff told defendant that at this time she was short of money. In view of the fact that plaintiff had been willing to sell a half interest in the business for $1,000, the fact that the values of stock and fixtures were only plaintiff's

estimates, and no estimate of the debts of the business was given, and plaintiff's testimony in many instances throughout the case, as well as in the instance of the bank account above mentioned, was shown to be unsatisfactory and unreliable, the fact that the business was conducted in premises rented by plaintiff at $30 per month which included her living quarters, the court could well have concluded that the value of this dress shop business was not any greater than the money which defendant claimed (and evidently the court believed) he brought to the community. He was a commercial fisherman. He owned a fishing boat and nets. On the latter he owed $900. He testified that plaintiff suggested that he sell his boat and that they move the dress shop to a location on Fillmore Street, where she had taken a lease, and that he put his money in the new store and that they become "fifty-fifty" partners. Less than three weeks before the marriage, and after their engagement, defendant sold his boat for $2,600, $2,250 in cash, the balance in installments which were paid within four months after the marriage. Of this money, defendant testified that $1,549.55 went into the new store at 1618 Fillmore Street, where the dress shop had been moved three or four days after the marriage. He gave the details of the spending of this money, which was used principally for constructing living quarters for the parties at the store. In January, 1943, he sold the fishing nets for $1,688, of which $1,600 was placed in the joint safe deposit box of the parties. At the time of the marriage plaintiff owned a Chevrolet auto four years old. This auto was used in the dress shop business until 1943 when, at a value of $65, it was turned in on a 1941 Chevrolet taken in their joint names, and the balance of the purchase price was paid with community funds.

Plaintiff testified that in her safe deposit box at the time of the marriage she had $10,800 in currency, which later went into the community properties. She first said it was in an envelope which she did not show to defendant when about three weeks after the marriage she placed the box in their joint names, and showed him her jewelry and the other contents of the box. She gave several versions as to the form in which this money was kept in the box and also as to its source. In view of her many contradictions, and the fact that in the bankruptcy proceeding four years previously she did not schedule the indebtedness of her brother to her which she testified then existed and in payment of which she claimed her brother gave her $5,000, a portion of the money in the box,

the court was justified in believing the testimony of defendant to the effect that he saw all of the contents of the box and that there was no such envelope or money in it.

Thus, there is substantial evidence that the parties started out their marriage on an equal or nearly equal financial basis.

## THE STORE BUSINESS

The store remained at 1618 Fillmore Street from a few days after the marriage until June, 1943. The lease had been obtained prior to marriage by plaintiff in plaintiff's name, but a few days after marriage defendant's name was added. Plaintiff testified this was done because of defendant's threats of bodily harm. This defendant denied. In June, 1943, the store was moved to 1640 Fillmore and in May, 1944, it was sold for a sum netting $23,750, after payment of its debts. The purchase money check was made payable to plaintiff. The bank account for the store at both locations was in the joint names. The source of the $500 deposit which was first made in the checking account was disputed, plaintiff giving several versions of its source, defendant contending it came from his Sausalito bank account. Plaintiff testified that defendant worked a short while as a longshoreman and then spent the most of the time loafing around the store. Defendant testified (and he was corroborated by one of the salesgirls) that he took an active part in the management and operation of the business, including selling merchandise. On April 7, 1943, articles of copartnership were executed by the parties stating that each of the parties had contributed half of the assets in the dress shop at 1618 Fillmore. The lease of 1640 Fillmore was taken in both names and the booklets advertising the shop gave the names of both parties as proprietors. Income tax reports for the years 1943 and 1944 showed the business as a community one and showed also that in the year 1943 the store netted approximately $20,000 and in 1944 up to the time of sale netted over $6,000. There is substantial evidence that in the operation of the business defendant worked equally as hard as plaintiff and was equally as responsible for its success.

## FISHING BOAT

In June, 1943, the fishing boat "Julia G." which defendant had sold just prior to marriage was bought back for $3,000, title being taken in the names of both as joint tenants. The source of $2,000 of the purchase price is in dispute. The balance came from the community moneys. Plaintiff at one time claimed, as does defendant, that the $2,000 came out of the

store moneys, but later plaintiff testified it came from her safe deposit money. As the court evidently did not believe that plaintiff had this money, it is reasonable to assume that the entire price of the boat came from the community moneys.

### LINCOLN WAY PROPERTY

This property was purchased in joint tenancy in March, 1944, for $16,000, subject to a bank loan of $9,000. The purchase agreement was signed by defendant alone, and $500 paid at that time. Later $6,000 in cash was paid. This sum defendant took from the safe deposit box and paid to the title company. He testified that this sum was made up of $1,600 from the sale of his fishing nets and $4,400 from the dress shop business. Plaintiff testified that she was the one who took the $6,000 from the box and paid it to the title company, and that it was a part of the money she claimed to have had in the box at the time of marriage. The title company receipt was made to defendant alone. Here again the court must have believed the defendant as against the plaintiff. We cannot say as matter of law that the court erred in that behalf.

### THE ASHBURY STREET PROPERTY

Defendant had resumed commercial fishing after the sale of the store in May, and testified that except for brief intervals he was away fishing until November. Plaintiff deposited the net proceeds of the store in her own name in the bank. Out of this account came $9,000 to pay off the mortgage on the Lincoln Way property. She then purchased the Ashbury Street property in June, 1944. The title was placed in joint tenancy. Of the $14,000 purchase price, $8,000 was paid out of the bank account in which the store sale price had been deposited. Some difficulty was had with this building. The basement flooded, defendant repaired the sewer, jacked up the building, constructed a new foundation, and did other construction work. The property was sold for $16,000 in April of 1946, netting $10,095.61, check for which was made payable to the parties jointly. It was deposited in a joint account in the bank. At the time of the trial there was a balance of $10,260.10.

### 1941 CHEVROLET

The history of the purchase of this automobile has heretofore been given. Except for the $65 turn-in value of the car which plaintiff had before marriage, this was paid for with community moneys. It was taken in the joint names of the parties.

### PRIOR DIVORCE ACTION

While plaintiff is not attacking the court's finding that the properties in question are community property, in view of the claim at the trial that all property except a $900 bank account was plaintiff's separate property, it is interesting to note that in a divorce action filed by plaintiff in November, 1945, she alleged that all of the real property (except the San Mateo property, which had not then been purchased), and the auto, the fishing boat, household furnishings, and moneys in various banks in an unknown amount, were community property.

### SAN MATEO COUNTY PROPERTY

A house and nine lots were acquired in August, 1946, in plaintiff's name alone. Immediately plaintiff executed a gift deed of the property to her sister. In December plaintiff acquired title by a tax collector's deed to five adjoining lots. She then executed to her sister a gift deed of these lots. Plaintiff contends that she purchased the property with $4,000 in currency given her by her sister which she took directly to the title company. The sister testified that the money was a part of $7,500 which she had accumulated without her husband's knowledge and which she hid in a coffee can in her Hayward home. However, the title company records showed that plaintiff gave the title company, not $4,000 in cash, but a cashier's check on a Haight Street bank in the sum of $3,800, which was the amount which she withdrew from that bank on July 29, when she closed that account which had contained deposits from rentals and defendant's earnings as a fisherman. Later plaintiff changed her story and claimed that she had not taken the $4,000 in currency to the title company, but had bought a cashier's check with $3,800 of it. In July, plaintiff wrote defendant two letters in which she stated that she was looking for a country home for them, and had decided to buy some property in San Mateo County. Defendant testified that in September they went to look at the property in question and she stated that they were going to see "our place" and that he worked there a couple of days. The evidence fully justified the court in finding that this property was purchased with community moneys and was community property.

### NO ABUSE OF DISCRETION

We have not attempted to detail all the evidence in the case. On the whole there was more corroboration of defendant's testimony than there was of that of plaintiff. Had the trial

court believed plaintiff the situation would have been different. But the court obviously believed defendant, and therefore, the case does not come within the rule expressed in *Pereira* v. *Pereira*, 156 Cal. 1 [103 P. 488, 134 Am.St.Rep. 107, 23 L.R.A. N.S. 880], where the court found that the husband had invested in the community business some $15,500 of his separate estate. As plaintiff has challenged the sufficiency of the evidence to sustain the court's findings she is required "to demonstrate that there is no substantial evidence to support the challenged findings." (*Nichols* v. *Mitchell*, 32 Cal.2d 598, 600 [197 P.2d 550].) The following quotation from that case applies here: "As was stated in the oft-cited case of *Crawford* v. *Southern Pacific Co.*, 3 Cal.2d 427, at page 429 [45 P.2d 183] : '. . . the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' which will support the findings, and when 'two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' (See, also, *Raggio* v. *Mallory*, 10 Cal.2d 723, 725 [76 P.2d 660]; *Fischer* v. *Keen*, 43 Cal.App.2d 244, 248 [110 P.2d 693]; *Laherty* v. *Connell*, 64 Cal.App.2d 355, 357 [148 P.2d 895]; *Wuest* v. *Wuest*, 72 Cal.App.2d 101, 104 [164 P.2d 32].) Careful review of the record here, in the light of these fundamental principles of law, does not sustain defendants' attack upon the propriety of the trial court's determination, and the judgment must be affirmed."

There was no abuse of discretion by the lower court in awarding plaintiff 60 per cent and defendant 40 per cent of the community property. Moreover, we do not feel that the circumstances of the case justify us in exercising the power given under section 148 of the Civil Code to revise in any particular the award made by the trial court.

While section 146 of the Civil Code requires that in cases of divorce on the ground of extreme cruelty, the court must award the innocent party more than one-half of the community property (*Eslinger* v. *Eslinger*, 47 Cal. 62; *Falk* v. *Falk*, 48 Cal.App.2d 762 [120 P.2d 714]), and section 148 grants to an appellate court the power to revise the award for "any apparent degree of error, though not amounting to an abuse of discretion" (*Strozynski* v. *Strozynski*, 97 Cal. 189, 191 [31 P. 1130]), it is clearly settled that the question of the amount of the award to be made in excess of the 50 per

cent rests largely in the discretion of the trial court. The situation is well expressed in *Falk* v. *Falk, supra.* Referring to section 146 the court said (pp. 770, 771): "The section confers upon the court a discretion in determining the amount of community property to be awarded to the respective parties when a divorce is granted on the ground of either adultery or extreme cruelty. That discretion must accord with justice in the light of the facts of the particular case and the condition or circumstances of the parties as provided by that section of the code. From the language of the second paragraph of that section, standing alone, it would seem that a division of the community property, under the circumstances contemplated therein, should not be disturbed on appeal except for an abuse of discretion. Section 148 of the Civil Code, however, confers authority on a court of review to revise the award of distribution of community property, regardless of the discretion vested in the trial court, so as to render justice pursuant to the provisions of section 146, as it appears to exist according to the judgment of the members of the reviewing court. . . . there is still a sound discretion imposed upon the trial court to determine under all of the facts and circumstances of the case, including the status of the respective parties and their needs, how much in excess of one-half of the community property shall be awarded to the innocent party. We have no disposition to interfere with that discretion of the court, even if we have the authority to do so." In *Crouch* v. *Crouch,* 63 Cal.App.2d 747 [147 P.2d 678], the discretion of the trial court is discussed as follows (p. 756): ". . . section 146 of the Civil Code confers upon the trial court a wide latitude for the exercise of its judgment and discretion in assigning the community property to the respective parties and in every case it will be presumed that such discretion has been wisely and properly exercised, and though impliedly requiring that more than one-half of the community property shall be awarded to the innocent party, it does not otherwise limit the discretion of the trial court in making the award. The proportion should depend upon the particular circumstances of each case, and where the trial court has exercised a legal discretion this court, though clothed with the power of revision under the statute, will be slow to interfere with that discretion. [Citing cases.]" (See, also, *Price* v. *Price,* 71 Cal. App.2d 734 [163 P.2d 501], and *Tompkins* v. *Tompkins,* 83 Cal.App.2d 71 [187 P.2d 840].)

In view of our decision of the case on the merits, we do not deem it necessary to consider the contentions raised by defendant as to the form of the notice of appeal.

The interlocutory decree and judgment of divorce is affirmed.

Peters, P. J., and Ward, J., concurred.