[Civ. No. 15473. First Dist., Div. One. June 19, 1953.]

AUGUST EDWARD ROEDER, Appellant, v. MARGARET JANE ROEDER, Respondent.

574

Joseph A. Brown for Appellant.

Lemuel H. Mathews, Joseph A. Kiernan and Maddux, Kiernan & Jonas for Respondent.

PETERS, P. J.—Plaintiff, August Edward Roeder, brought this action against his grandniece, Margaret Jane Roeder, to set aside a deed and to compel a reconveyance of certain real property on the ground that such deed had been secured by fraud, undue influence and mistake, and that there had not been a valid delivery. The trial court found a valid delivery, and that there was no fraud or undue influence, that plaintiff was competent at the time of delivery, and that the parties intended (defendant having so averred in her answer) that a life estate should be reserved to plaintiff. Judgment was entered reforming the deed and determining that de-

fendant was the owner of the property subject to a life estate in plaintiff. Plaintiff appeals, contending that, as a matter of law, the evidence shows that the deed was executed as the result of mistake, that it was secured by fraud and undue influence and in violation of a confidential relationship, and that it was error to grant him the partial remedy of reformation.

The evidence most favorable to defendant shows the following:

The deed by which plaintiff conveyed the property in question to defendant was delivered December 2, 1949, at which time plaintiff was 77 years of age. The property involved is a 12-unit apartment house in San Francisco which produces an income of $450 to $500 a month, plaintiff's only substantial source of income. Plaintiff lived in the apartment house and managed its operations. For many years prior to 1949 plaintiff and the family group of defendant had been friendly, and exchanged visits, they being his only blood relatives known to any of the witnesses. Plaintiff is defendant's great-uncle, her father, Emory Roeder, being plaintiff's nephew. The Emory Roeders live in Alameda. Commencing in about September, 1949, plaintiff began to discuss with the Emory Roeders problems concerning the management of the apartment house, inasmuch as he was having difficulties with some of the tenants and with repairmen and contractors. Defendant, who was working as a secretary, frequently had dinner with plaintiff at his apartment and would remain an hour or so thereafter and listen to her uncle talk about his management and tenant problems. During these conversations plaintiff urged his niece to come and live in the apartment house to assist him in its management. He told her that he was getting old and needed someone he knew to help him. At one stage in the discussions he offered defendant a full-time job as manager of the apartment house at the same salary she was earning as a secretary. He told defendant that several years before 1949 he had made a will leaving the property to her, and he told her and other witnesses that sooner or later defendant would own the property and that she might as well come over and get acquainted with it and at the same time relieve him of some of the work.

Sometime in November of 1949 plaintiff agreed to convey the property to defendant, and she agreed to come and live at the apartment house and assist her uncle in its manage-

ment. After plaintiff had told defendant that he had willed the property to her, she told plaintiff that inheritance taxes might be costly and that she wanted, if possible, to avoid paying this tax. She suggested that a deed of gift might avoid complications at his death. She also told him that such a deed would not change the status of the property so far as he was concerned. Plaintiff evidenced an interest in this method of handling the transaction and suggested that she investigate its possibilities. Defendant consulted with one Howen, an old friend of plaintiff and an old friend of defendant and of her family. Howen confirmed her impression that a deed was a proper method of handling the transaction. Thereafter, and later in November, defendant told plaintiff what she had discovered. In this conversation she told plaintiff that ''I had found out that there was an instrument called a gift deed that would transfer the property into my name . . . and would eliminate any difficulty at the time of his death, but at no time was I interested in any of the revenue or the income from the property, that that was all to still be his and he was to still live in the apartment house as he had done during the years, and that in effect the only thing that would be changed would be the fact the property would be in my name and not in his.'' At this, or a subsequent, conversation defendant told the plaintiff that if he executed the deed he would retain all the rights of an owner except that the title would be in her name, and that the deed would make no difference in his right of control over the property. It did not enter her mind to tell him that the oral agreement limiting the deed would not be binding if she should die, or that she could mortgage or sell the property without his consent. While she knew her general legal rights as owner, she did not give the matters relating to the legal consequences of the transaction another thought, because it never entered her mind that she would ever deprive plaintiff of his rights to the rents or other control of the property.

Defendant testified that, after plaintiff had told her to do so, she asked Howen to draft the deed, and that he did so from a legal description secured from the original deed which plaintiff had secured from his safe deposit box. The plaintiff went to his bank alone and secured the original deed and delivered it to defendant to be used for this purpose. The deed was prepared by Howen and delivered to defendant on November 30, 1949. On December 2d she delivered it to plaintiff. Then she and plaintiff visited a notary in San

Francisco and the deed was executed, acknowledged and delivered. The notary testified that plaintiff presented the deed to her and asked if she would acknowledge it. Upon being asked by the notary, plaintiff stated that he knew what he was signing, and did so in her presence. After the signature was acknowledged the deed was handed to plaintiff who, in turn, handed it to defendant. The defendant had the deed recorded.

Defendant, thereafter, commenced to assist plaintiff in the management of the apartment house. Early in February of 1950, defendant, after redecorating one of the apartments, moved in and proceeded to assist her uncle in the management of the project as she had agreed. She managed the apartment, collected the rents, deposited them in her uncle's commercial account, paid the bills, and handled the complaints of the tenants and contractors. Plaintiff expressed to defendant, her family, and to various friends, his pleasure at this arrangement. This continued until April 10th or 11th, 1950, when defendant contracted pneumonia, and returned to her home in Alameda for treatment. She remained in Alameda until the first week in May, when she returned to the apartment house and resumed her duties as manager. At no time did she attempt to retain the rents for her own use, or exercise her legal rights under the deed.

About this time plaintiff became engaged to and married a divorcée, Jeanette by name, then about 34 years of age. Plaintiff was then 77. Plaintiff had known Jeanette for about a year prior to the marriage, she being the renter of a garage in the apartment house. In May, plaintiff introduced Jeanette to defendant as his fiancée. Apparently at this conversation it was suggested that Jeanette would like defendant's apartment. Defendant told Jeanette that the apartment building was in defendant's name and that it was her responsibility to stay on the premises. Plaintiff married Jeanette on May 8, 1950. Thereafter, relations between the parties rapidly deteriorated. On May 10th or 11th the plaintiff and his new wife visited the Emory Roeders in Alameda. Emory Roeder was then sick in bed. Jeanette demanded the key to plaintiff's safe deposit box, then in the possession of Emory Roeder, and demanded that defendant convey the apartment house back to plaintiff. Plaintiff did not participate in this conversation, although he was present. Mrs. Emory Roeder protested discussing such matters while her husband was ill,

and the conversation was terminated. A few days later the safe deposit key was sent to plaintiff.

A few days after this occurrence plaintiff came to defendant's room hungry and temporarily deserted by his new wife. Defendant took him to Alameda, and her family fed and cared for him. By that time the complaint in this action had already been filed, but such fact was unknown to defendant until several months later when she was served. Nevertheless, on this visit, plaintiff said nothing about the property, nor did he mention the action then on file. Howen also testified that, about this time, plaintiff complained to him about being lonesome, and being compelled to prepare his own meals.

As a result of these controversies, the defendant moved out of the apartment on June 10, 1950, and was served with process in this action several days later.

At the time of trial, which was in November, 1951, plaintiff gave the definite impression that he was then incompetent. He could not recall the execution of the deed; claimed that his signature was a forgery; denied deeding the property to defendant; denied ever willing the property to her; denied ever discussing deeding the property to defendant; denied that there was a mortgage on the apartment although the existence of such was an admitted fact; was unable to remember marrying Jeanette, and could not recognize her in the courtroom; and could not identify his signature on the complaint. But whatever plaintiff's mental condition was in November of 1951, the evidence clearly supports the finding that in December of 1949, when this deed was executed, plaintiff was rational and competent. This was testified to not only by defendant and her family, but also by Howen, the notary public who acknowledged the deed, the bank teller where plaintiff had his account, and by plaintiff's wife.

It is one of the major contentions of plaintiff that, as a matter of law, this evidence compels a finding that his consent to the deed was secured either as a result of a mutual mistake of law, or as the result of a mistake of plaintiff known to and taken advantage of by defendant. Plaintiff also objects to the failure to find specifically on the issue of mistake.

Insofar as this last contention is concerned, while the trial court made no specific finding on mistake, it did find that the deed, subject to the agreed intent to reserve a life estate, was valid and binding; that plaintiff was competent

and aware of what he was doing; that the transfer of title was pursuant to plaintiff's "voluntary act and intention . . . to transfer title," and that such consent was not secured by misrepresentation or domination of defendant. While it is reversible error not to find on a material issue, it is also the law that "it is not necessary to make specific findings as to each of several material issues where the findings, taken as a whole, or construed together, clearly show that they include the court's conclusion upon the material issues." (*Petersen* v. *Murphy*, 59 Cal.App.2d 528, 533 [139 P.2d 49]; see, also, *Bowers* v. *Union Trust Co.*, 117 Cal.App. 259 [3 P.2d 614]; *Chamberlain* v. *Abeles*, 88 Cal.App.2d 291 [198 P.2d 927].) The findings that were made preclude the possibility that plaintiff was misled or mistaken, so that failure to specifically find thereon was not error.

 As to whether these findings to the effect that plaintiff executed the deed voluntarily and, by implication, not as the result of a mistake, are supported, there is ample evidence and reasonable inferences therefrom to support them. Plaintiff argues the facts at some length. He places his main reliance on defendant's statement that she told plaintiff that if he executed the deed there would be no change in the status of, or his control over, the property, but knew generally at that time that she could sell the property if she wanted to. Of course the deed did change the control of plaintiff over his property. But the record shows that what defendant meant was that, insofar as plaintiff's control and right to income from the property and his right to manage it during his lifetime were concerned, the deed would make no difference. The only "mistake" was in failing to reserve to plaintiff, in express terms instead of by oral agreement, a life estate, and that oversight has been recognized by the reformation of the deed granted in the judgment. The evidence supports the reasonable inference that plaintiff so understood the transaction. He had been a successful contractor for many years, and had managed this property for a long time. It is reasonable to infer that, by executing and delivering a deed to the property to defendant, he knew that he was parting with title. He wanted defendant to have the property and was content that she should have the title as long as his right to the income was not impaired during his lifetime. Defendant told him that a gift deed would put the property in her name. Once the trial court found that he was competent (and we have already held that the finding on that issue is

supported), the trial court was entitled to infer that plaintiff knew what defendant intended by her statement, and knew that he was conveying title to her.

The plaintiff next contends that the parties were in a confidential relationship, that the facts disclose that she handled the transaction and controlled it for her own benefit, and that such facts raise a presumption of invalidity because plaintiff was not afforded independent legal advice. It is urged that in the absence of such advice, and in the presence of fraud, actual or presumed, the trial court was, as a matter of law, bound to set aside the deed.

Of course, if a confidential relationship existed between the parties, any transaction by which she secured a benefit over her uncle would be presumptively fraudulent and the burden would rest on defendant to show full disclosure and that no unfair advantage was secured. (*Nobles* v. *Hutton,* 7 Cal.App. 14 [93 P. 289] ; *Brison* v. *Brison,* 75 Cal. 525 [17 P. 689, 7 Am.St.Rep. 189] ; *Payne* v. *Payne,* 12 Cal.App. 251 [107 P. 148].) These were cases involving the affirming of the finding of the trial court that there existed a confidential relationship and an abuse of it. But even where the presumption of invalidity arises because of the confidential relationship (Civ. Code, § 2235), the presumption is rebuttable. It is a question of fact as to whether there was a fair disclosure, any overreaching, and as to whether the grantor acted voluntarily and with full understanding. (*O'Neill* v. *Dennis,* 109 Cal.App.2d 210 [240 P.2d 376] ; *Ginn* v. *Podesta,* 8 Cal.2d 233 [64 P.2d 1090] ; *Cella* v. *Cosgro,* 115 Cal.App.2d 816 [253 P.2d 57] ; *Goldman* v. *Goldman,* 116 Cal.App.2d 227 [253 P.2d 474].) The findings on these issues are all adverse to plaintiff, and such findings are amply supported by the facts already set forth.

Plaintiff places considerable reliance on the fact that he did not have independent legal advice, and apparently contends that where a confidential relationship exists the absence of independent legal advice establishes fraud as a matter of law. That is not the law. The absence of legal advice, where a confidential relationship exists, is a factor, and an important one, to be weighed by the trial court in determining whether the relationship has been violated, but it is not an absolute essential to a valid conveyance to a confidant. In *O'Neill* v. *Dennis,* 109 Cal.App.2d 210, at page 214 [240 P.2d 376], the court stated the proper rule as follows: "Appellant makes the point that she was entirely without the benefit of

independent advice in the transaction and urges reversal of the judgment on this ground. Lack of independent advice by the grantor is not of and in itself a ground for vitiating a deed under such circumstances as we have here presented, but is a fact to be weighed by the trial court in determining whether the grantor acted voluntarily and with a complete understanding of the transaction. (*Brown* v. *Canadian Industrial Alcohol Co.*, 209 Cal. 596 [289 P. 613]; *Laherty* v. *Connell, supra* [64 Cal.App.2d 355 (148 P.2d 895)]; *Azevedo* v. *Leavitt, supra* [76 Cal.App.2d 321 (172 P.2d 704)].)''

Thus, even if a confidential relationship here existed, the findings of fairness and no overreaching being supported, the transaction would not have to be set aside as a matter of law.

But the trial court has found that no confidential relationship existed. The question as to whether such a relationship did or did not exist, in the legal sense, was, under the facts, a question of fact, and the burden of showing its existence rested on the one asserting it, in this case on the plaintiff. The evidence does not compel the conclusion that such burden was sustained. ■ To the contrary, the evidence supports the finding of no confidential relationship. When the deed was executed the defendant was a young woman. The plaintiff was an experienced businessman, who, while elderly, had been taking care of himself and his business affairs for many years. Defendant, when the deed was executed, did not live in the apartment house. She saw her great-uncle only intermittently, and did not then assist him in the handling of his business affairs. The most the record shows is that defendant, on occasion, talked with him about his affairs. Plaintiff had ample opportunity to secure independent advice if he wanted it, and defendant did nothing to prevent him from securing it. It was plaintiff who suggested that defendant look into the procedure of executing a deed of gift, and he, it was, who went to his bank, alone, and secured his old deed. These facts do not compel a finding that a confidential relationship in the legal sense existed. *Wilson* v. *Sampson*, 91 Cal.App.2d 453 [205 P.2d 753], involved a factual situation somewhat similar to the one here involved. In sustaining a finding of no confidential relationship the court, at page 459, stated: ''We cannot say that there is no substantial evidence to sustain the findings. Even the evidence set forth in appellant's brief does not establish a confidential relationship between William H. Sampson and appellant as all it shows is that Sampson roomed at appellant's rooming house on the

Tennessee Street property, sometimes helped her with her work, and that they frequently sat together and 'talked very friendly.' Appellant testified that Sampson made love to her, but even so, friendship, affection, and even intimacy existing between two parties does not constitute a confidential relationship. (*Meyer* v. *Zuber*, 92 Cal.App. 767, 772 [268 P. 954]; *Jackson* v. *Gorham*, 98 Cal.App. 112, 116 [276 P. 391].)''

The parties quarrel extensively over the proper application of the rules announced in *Herbert* v. *Lankershim*, 9 Cal.2d 409 [71 P.2d 220], to the facts of this case. There, it is true, the Supreme Court held that, although the evidence was somewhat conflicting, an implied finding of the trial court that the confidant of an aged and feeble old man had rebutted the presumption that she had secured a $500,000 note from him by fraud, was unsupported. As was said in *Taylor* v. *Wright*, 69 Cal.App.2d 371, 387 [159 P.2d 980], that case has been "frequently relied upon [by litigants] but seldom followed [by the courts]." Certainly the case does not stand for the proposition that the appellate courts can or should reweigh the evidence or upset findings based on substantial credible evidence or upon reasonable inferences therefrom. The case has no application to the facts here presented.

■ The next contention of plaintiff is that it was error to grant to him the partial remedy of reformation and to deny to him the requested complete remedy of rescission. This contention is largely a repetition of the arguments that defendant misrepresented the legal effect of the deed, was fraudulent, and exercised undue influence. Of course, if such charges were true, it would have been error to reform the deed so as to grant to plaintiff a mere life estate and to deny to him rescission. But those charges, as already pointed out, were found to be untrue, and the findings are supported. The granting of reformation was fair and enforced the intent of the parties. Both parties intended from the beginning of this transaction, that plaintiff should retain, during his lifetime, the income from the property and the general management of the apartment house. Defendant at no time has asserted that an absolute grant was intended. She has at all times conceded, not only by words but by .her actions, that a life estate was to be retained by plaintiff. She made that agreement but did not insert it in the deed. Both parties were then content to rest upon her oral assurances. The reformation grants to plaintiff the protection that did not exist

under the oral arrangement, and it is in accord with the intent of the parties.

In his reply brief for the first time plaintiff argues that reformation was outside the issues raised by the pleadings. This practice of raising new points in the reply brief is not to be commended. The point now sought to be raised, however, is without merit. ▮ While defendant did not specifically pray for reformation, she did plead the facts in relation to the oral agreement, and did pray for general relief. That was sufficient to permit the court, in the exercise of its broad equity powers, to grant the relief here involved.

▮ Plaintiff also argues that, because the trial court found that plaintiff was elderly and, after the date of the conveyance, married a much younger woman, and shortly thereafter sought to regain the property, the trial court must have been motivated by these facts, which are claimed to be immaterial. All of these challeged facts as found are amply supported. The challenged facts were not immaterial. The basic question was the motive of plaintiff in executing the deed. On this issue it was relevant to try to show that the attempted renunciation of the transaction was based on a change of mind after marriage rather than upon a lack of the requisite intent at the time of the conveyance. The challenged findings were relevant on this issue.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 13, 1953.