[Civ. No. 6347. Second Appellate District, Division Two.—February 6, 1929.]

In the Matter of the Estate of MATHIAS WALTER OFFILL, Deceased. ADDIE O. FREEMAN, Respondent; E. LOUISE BELL et al., Appellants.

Nelson D. Miller and Anderson & Anderson for Appellants.

Frankley & Spray and Max Mayer for Respondent.

STEPHENS, J., *pro tem.*—A purported will of Mathias Walter Offill, deceased, was offered for probate under petition of E. Louise Bell, for letters with the will annexed. Addie O. Freeman, a daughter of deceased, contested the probate thereof on a number of separate grounds. Only three of the grounds of contest need be noticed herein, and they put in issue the points covered by the following references and quotations from the court's findings.

After hearing without a jury the court found that neither of the alleged witnesses "signed said purported will as attesting witnesses or witnesses in the presence of said decedent." That "said decedent did not at the time of or prior or subsequent to the subscribing of said purported will, declare to Ann Gambs, B. R. Darling and R. J. Darling, or any or either or all of them, that the instrument was his will." That " . . . the decedent did not, by word or action, or in any manner whatever, request the said [witnesses] or either or any of them, to sign said purported will as attesting witnesses."

Based upon these points the court denied the probate of the will and proponent appeals.

Decedent had been married twice. The contestant was the only surviving child of the first union. The second marriage was between decedent and a widow, the mother of several children. The determination of this contest will decide whether the surviving child shall take as an heir or share the estate with the decedent's stepchildren, as provided by the terms of the purported will.

The second wife, after many years of life with decedent, predeceased him by a month or so. The property affected by the will was held in joint tenancy. Shortly after her death he caused the stepchildren (his own daughter not then being in the home) to come into his room where he lay sick abed, and indicated to one of them that he desired to make a will. That he wanted a Mr. R. J. Darling or Mr. Pierce or anybody called in for witnesses. Mr. Darling and his son, B. R. Darling, responded. Decedent said he wished to leave his estate share and share alike to all. One of the stepdaughters, at decedent's request, wrote out these wishes by lead pencil and decedent signed, and the paper was passed to the Darlings who were standing at the foot of the bed, and they signed as witnesses. The nurse, Ann Gambs, also signed as a witness. The signing and witnessing of this will seemed to have been according to all of the legal requirements, but someone suggested that a lawyer should be called. Thereafter, an hour or more having elapsed, the same people (six, eight, or ten) again assembled in the sick man's room, and there was in addition a Dr. O'Flaherty, who was practicing medicine, but was also an attorney, although not in the active practice of the law. The doctor,

who was not attending the sick man, had been induced to help out because a practicing lawyer could not be secured. He had partly prepared a will on the typewriter before leaving his office and before seeing the sick man, and copied by long-hand in ink the devising part of the pencil will into a blank of his typewritten form and entered the sick room. Dr. O'Flaherty approached the bed, exhibited the document to the sick man, who was propped up by pillows and who was from time to time giving evidences of pain by groaning and moaning, and then read it aloud.

The testimony of Dr. O'Flaherty as to the signing, which is not varied from materially by other witnesses, is as follows: "Q. Was the will read to him? A. After I took it away from him I read it to him specifically, just as it is written here, and asked him if that was his will. . . . And the old gentleman said 'Yes,' . . . So I told him that it would be necessary to sign the will in the presence of two witnesses who were standing at the foot of the bed, Mr. Darling and his son. The Court: Did you mention those names to Mr. Offill? A. I don't believe I did, your Honor, because I presumed that he knew who they were. He seemed to be all right. So he . . . took the pen and signed it after I read it to him, and I told Mr. Darling it would be necessary for him and his son to sign it in the presence of Mr. Offill.''

The doctor then (and the younger Darling's testimony differs in some respects therefrom) stated that the Darlings were standing right up against the foot of the bed—that Mr. Offill was still sitting up in bed. Both of the Darlings signed above the foot of the bed, using a magazine to write upon. The will was again in the doctor's hands and he told Ann Gambs, the nurse, who had signed the pencil will, that two witnesses were sufficient, but she could sign, too, and she did.

B. R. Darling testified: "Q. Examine the signature, M. W. Offill. Was that signature signed in your presence? A. Yes, sir. Q. When and at what time? Where and at what time? Where was that signed? A. Why, in the bedroom. I don't remember the time of day. Q. Of what house? A. Mr. Offill's house. Q. In Santa Monica? A. Yes. Q. Examine the date and see if that is the date it was signed. (Showing paper to witness.) A. I think it is. Q. Did he sign in

your presence? A. Yes. Q. Did you sign in his presence?
A. Yes. Q. Did R. J. Darling sign in your presence?
A. Yes. Q. And Ann Gambs? A. Yes. Q. And did R. J.
Darling sign in the presence of the testator, Mr. Offill?
A. Yes. Q. Mrs. Gambs signed in the presence of Mr. Offill?
A. Yes.''

The witness further testified that when he signed the will
presented by Dr. O'Flaherty he took the will from his father,
R. J. Darling, and when he signed, two or three persons were
between him and the foot of the bed; that he was standing
some few feet back of the foot of the bed. He did not notice
at the moment of signing whether the line of vision was
clear between himself and Mr. Offill or not. He also testified
in answer to the court's question: ''We signed at the foot of
the bed.'' ''Q. By the Court: Where was Mr. Offill at that
particular time—sitting up in bed or lying down? A. In
bed. He laid back down. . . . Q. By the Court: Did you
observe him at all after he actually appended his signature
to that document? A. No.'' The court then asked if he is
to understand that Mr. Offill was placed flat in bed after
signing, and the witness answered in the affirmative, and
that he did not observe Offill at all after that; he further
testified that he thinks the vision between himself and the
testator was obstructed by the foot of the bed when he signed
as a witness. That he was standing at the time and some-
one held a magazine in his hand to rest the will upon as
the witness signed. He estimated the bed as being three or
three and one-half feet high and the point at which the
will was held on the magazine to be about four feet high;
that Mr. Offill said nothing from the time he said ''Yes'' to
the doctor's question until after the signing was completed.

Dr. O'Flaherty and the nurse testify that Mr. Offill sat
propped up by pillows all of the time until after the sign-
ing by the witnesses, after which the pillows were taken
away and he was laid back. Dr. O'Flaherty says that no
one was between B. R. Darling and Offill at the moment of
Darling's signing.

The nurse also testified: ''Q. What did you actually see?
A. He (B. R. Darling) went to hand it (the will) back, I
presume, to Dr. O'Flaherty, he made this motion, and Mr.
Offill he looked up, and he motioned to me; and I said,
'Might I sign this also?' And Dr. O'Flaherty said, 'Per-

haps you better; you are the nurse; watched the case; perhaps you better sign too.' ''

There was testimony by other witnesses. No other witness indicates that B. R. Darling was anywhere but at the foot of the bed beside his father when he signed. There is no other testimony (if B. R. Darling's testimony goes that far) to the effect that Mr. Offill was laid down off the pillows as soon as he signed. There is other testimony that he sat propped up and observed everything going on until after the three witnesses had signed. The evidence is uncontradicted that the bed was a steel Simmons bed, presumably of ordinary height.

Section 1276 of the Civil Code is as follows:

"Written will, how to be executed. Every will, other than a nuncupative will, must be in writing; and every will, other than an olographic will, and a nuncupative will, must be executed and attested as follows:

"1. It must be subscribed at the end thereof by the testator himself, or some person in his presence and by his direction must subscribe his name thereto;

"2. The subscription must be made in the presence of the attesting witnesses, or be acknowledged by the testator to them to have been made by him or by his authority;

"3. The testator must, at the time of subscribing or acknowledging the same, declare to the attesting witnesses that the instrument is his will; and,

"4. There must be two attesting witnesses, each of whom must sign the same as a witness, at the end of the will, at the testator's request and in his presence."

This state of facts presents the question: Is there any considerable testimony to support conclusions (A) that at least two witnesses did not sign in the presence of the decedent; (B) that the decedent did not declare to at least two of the alleged witnesses that the instrument was his will; (C) that decedent did not in any manner request at least two of the alleged witnesses to attest his will as witnesses? There is ample evidence to support the proponent's claim that the required number of witnesses were requested to witness this instrument as decedent's will, and that they did so in the testator's presence. Is there evidence worthy of consideration in conflict with this view? If so, the judgment must be affirmed. If not, the judgment must be re-

versed. We shall approach the question, taking up the last-named phase first.

■ (C) We think that the fact that the two Darlings were present and signed the pencil will and that they were also present near the foot of the bed when the propounded will was signed, and that the doctor mentioned the fact that these two persons present would sign as witnesses, is sufficient to sustain the conclusion that they were requested to sign according to the legal requirement, and we find no evidence to the contrary.

■ (B) We think the evidence briefly referred to herein, together with the answer ''Yes'' by decedent to the doctor's question as to whether or not the instrument was his will, is sufficient to sustain the conclusion that decedent did declare to all present at the time of signing that the instrument signed was his will, and we find no testimony to the contrary. ■ ''It is not necessary that the testator should have spoken words declaring the document to be his will, or that he should expressly request the witness to sign it as such. It is sufficient if this declaration and the request are unmistakably indicated to the persons signing as witnesses by the testator's conduct and actions, although there is no declaration in words to that effect.'' (*Estate of Silva,* 169 Cal. 116, at 120 [145 Pac. 1015] ; see *Estate of Dow,* 181 Cal. 106 [183 Pac. 794], and cases therein cited.)

■ (A) There is no evidence contradicting and no circumstance inconsistent with the nurse Ann Gambs' account of how she came to sign. She signed the first or pencil will in the immediate presence of the testator. She and Dr. O'Flaherty were close to the testator when the conversation took place as to her signing the second will. It is natural that the nurse should watch her patient carefully under the trying circumstances. There is every reason to believe, and apparently no reason to disbelieve, her testimony as to the sick man's ''motion.'' But disregarding the motion entirely, the circumstances surrounding the drawing of the will support the conclusion that she was requested to sign.

We think there is no evidence from which the conclusion could be drawn that R. J. Darling did not sign in the presence of decedent. The testimony is that he stood, while signing, by the foot of the bed, and there is no testimony

from which it could be found, whether the decedent had been lain back upon the bed or still was propped up, that the two were not in plain sight of each other.

The meaning of the word "presence" in the statutory requirement that "There must be two attesting witnesses, each of whom must sign the same as a witness, at the end of the will, at the testator's request and in his presence has been treated fully in the leading case of *Estate of Dow, supra,* and supports the theory that the testator need not actually view the act of signing, but the circumstances must be such that the testator could have seen the signing. The English cases follow the same theory in the construction of a statute of similar nature." (*Shires* v. *Glasscock,* 2 Salk. 688 [91 Eng. Rep. 584]; *Davy* v. *Smith,* 3 Salk. 395 [91 Eng. Rep. 892].)

Mr. Justice Wilbur in the Dow case, *supra,* calls attention to the fact that a testator is presumed to be of sound mind throughout the execution of the will and that this presumption justifies the conclusion that the maker of the will was not unconscious or asleep meanwhile. It may be recalled that the court in the instant case specifically found the testator to be of sound mind. Therefore the presumption comes to the aid of the testimony that the testator, whether propped up or lying back on the bed, was awake, conscious, and aware of what was going on.

The only point remaining undisposed of is: Does the testimony support a finding that B. R. Darling was not in the presence of decedent when he signed as a witness to decedent's will?

In approaching the question we know of no more apt words than those of Mr. Justice McFarland so often quoted from *Field* v. *Shorb,* 99 Cal. 661, 666 [34 Pac. 504, 505]:

"We are adverse to holding that a finding by a jury or trial court on an issue of fact is not warranted by the evidence, whatever we might think as to its preponderance, where there is presented a fair, reasonable ground for a difference of opinion, and where a conclusion either way could not be considered as the necessary result of the exercise of an unsound judgment. But where the great current of the evidence is against the verdict, and we cannot escape the conviction that it is wrong, we should not be deterred from setting it aside by the contention that one or two general

statements or assertions of one or two witnesses bring the case within the rule which governs in cases where there is a *material* 'conflict of evidence.' ''

In the case of *In re Coburn,* 11 Cal. App. 604, 620 [105 Pac. 924, 931], it is said: ''We are fully aware that an appellate court will not reverse a finding if there is a substantial conflict in the evidence; but the evidence, in order to raise a conflict, must be such as to present a fair and reasonable ground for a difference of opinion. The finding or verdict must have meritorious support in the evidence. A few general statements without substantial reasons is not sufficient to raise a conflict.'' (See, also, *Smith* v. *Belshaw,* 89 Cal. 427, at 430 [26 Pac. 834]; *Wenban Estate, Inc.,* v. *Hewlett,* 193 Cal. 675, at 693 [227 Pac. 723]; *Estate of Presho,* 196 Cal. 639 [238 Pac. 944]; *Felsenthal* v. *Warring,* 40 Cal. App. 119, at 134 [180 Pac. 67]; *White* v. *Greenwood,* 52 Cal. App. 737, at 742 [199 Pac. 1095].)

We also have in mind that no evidence as to the fact that the will truly expresses the testator's wishes can dispense with proper proof of every legal requirement in the making of the will. (*In re Walker,* 110 Cal. 387 [52 Am. St. Rep. 104, 30 L. R. A. 460, 42 Pac. 815]; *Estate of Seaman,* 146 Cal. 455 [106 Am. St. Rep. 53, 2 Ann. Cas. 726, 80 Pac. 700].)

With these principles to guide us in studying the testimony, we have concluded that when B. R. Darling signed the propounded will he did so in the actual presence of decedent, and also in legal contemplation, in the presence of decedent. His written attestation to the will states this to be a fact. In the early stages of his testimony in this case he affirms it. Later his testimony is somewhat uncertain and he explains: ''But it made me feel so bad to go in there and see an old man—I had never witnessed anything like that before—that I was flustered, I guess.'' His testimony as to his position when signing the instrument is not definite and out of accord entirely with the testimony of all the other witnesses. The same is true of his testimony to the effect that there were persons between himself and the bed occupied by the testator at the moment of signing, and not consistent with his own testimony, for he concludes on that subject as follows: ''The Court: Who was standing between you and the foot of the bed? A. I don't remember. The

Court: How many people do you recall? A. It seemed like three or four. The Court: Were they directly between you and Mr. Offill at that particular time? A. I didn't notice. The Court: Your line of vision? A. I did not notice."

It seems to us that the final assertion that he did not notice that persons who were standing between him and the foot of the bed were or were not in the line of vision between himself and the testator leaves that point without any evidence at all.

The testimony about the obstruction of the vision by the foot of the bed seems wholly destroyed by the court's clear examination, but aside from that it is out of line of all of the other testimony and with the admitted physical facts. (*Felsenthal* v. *Warring, supra.*) The witness was standing at or near the bed foot, writing. He was writing on a book held by someone for him. The bed was not a structure of wooden head and footboard but was a steel bed of common manufacture. Evidence, if it is evidence, of no greater probative nature than that can be of no use at all where there is clear evidence negativing it. To borrow an expression from the opinion in *Wenban Estate, Inc.,* v. *Hewlett, supra,* the testimony "is so nebulous and evanescent as to render it nothing more than a mere pretense of evidence."

At best, the evidence of B. R. Darling is self-contradictory, uncertain and by his own admission indefinitely recalled from a "flustered" mental reception of the facts as they occurred.

In our opinion, the evidence does not support the court's finding that B. R. Darling was not in the presence of the testator when he signed as a witness to the will.

The judgment is reversed.

Works, P. J., and Thompson (Ira F.), J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on March 6, 1929.