[Civ. No. 20321. Second Dist., Div. Two. July 21, 1955.]

JOE CAMPERI et al., Appellants, v. ANNA CHIECHI, Respondent.

[Civ. No. 20322. Second Dist., Div. Two. July 21, 1955.]

Estate of CIRO CAMPERI, Deceased. JOE CAMPERI et al., Appellants, v. ANNA CHIECHI, as Executrix, etc., et al., Respondents.

Edmond Gattone and Warner I. Praul for Appellants.

John E. Sisson and Guy T. Graves for Respondents.

FOX, J.—Slightly less than six months after the will of Ciro Camperi (referred to herein as Ciro), was admitted to probate and letters testamentary issued to one of his five surviving children, Mrs. Anna Chiechi (designated herein as Anna), a contest of the will was filed. The will had been executed on November 5, 1949, when Ciro was about 86 years old. His death occurred on September 22, 1950. The contestants are Joe and Anthony (Tony), sons of Ciro, Lucy (Lucia) Biondolillo, his other daughter, and Frieda Hanson and Colleen Camperi, the children of Ciro's predeceased son John. The grounds of contest are unsoundness of mind, undue influence exercised on the part of Anna, and want of due execution.

Thereafter, all of those named as contestants, and joined by another of Ciro's sons, Ross (Rosolino) Camperi, initiated an action (No. 604316 below) against Anna individually and as executrix to set aside a deed by which Ciro conveyed certain parcels of real property to Anna, to recover from Anna the proceeds derived from a warrant issued to Ciro by the county of Los Angeles in settlement of a condemnation proceeding, for an accounting of rents and profits allegedly collected by Anna from Ciro's property, and to impress a trust on the above described real and personal property.

Both actions were consolidated for trial by the court sitting without a jury. The court denied the petition for revocation of probate and rendered judgment in Anna's favor. In the companion case Anna likewise prevailed and judgment was rendered against plaintiffs therein. The appeals taken from both judgments are consolidated for purposes of review.

Ciro's last will, a very brief and simple document, devised and bequeathed his estate as follows: To his children Joe and Lucy and his granddaughters Frieda Hanson and Colleen Camperi the sum of $1.00 each; the residue, in equal shares, to his remaining children, Anna, Ross and Anthony. Anna was named as executrix without bond.

The principal assignments of error are (1) that the findings of due execution of the will and absence of undue influence by Anna in procuring it are not supported by the evidence and are contrary thereto; (2) (a) that the inter vivos conveyance of real property from Ciro to Anna made at the time the will was signed was never effectuated by delivery of the deed; (b) that assuming delivery, the conveyance was made upon an oral trust and not as a gift; (c) that Anna

procured the deed by virtue of her confidential relationship to Ciro and has failed to rebut the presumption of fraud arising from such transaction; (3) that a joint tenancy bank account agreement between Ciro and Anna was procured by Anna's undue influence stemming from her fiduciary relationship with Ciro. Several other claims of error will be adverted to and considered subsequently.

## BACKGROUND FACTS

The record discloses that Ciro, who was of Sicilian origin, immigrated to the United States in about 1898, at which time he was 35 years old. He had been married abroad six years earlier to Frieda Biondolillo. Frieda died in 1932 and Ciro remained a widower until his death. Ciro's primary occupation was that of a railroad yard laborer for the Southern Pacific Company. He was so employed for almost 24 years until his retirement upon a pension in 1923. This monthly pension was originally $19.10 but was gradually increased to $24.10.

Ciro never attended school in Italy and had little, if any, formal education. His principal spoken tongue was the dialect of his native province, but he had sufficient mastery of the basic Italian language to converse with numerous friends who came from various parts of Italy. Although a resident of the United States for over 50 years, his ability to read and write English was fairly limited. However, he could read his name in English, he could identify the months of the year, was able to read his utility bills and could read various items advertised in newspaper sales and their selling prices. He knew the alphabet and was able to write his name in English, although near the end of his life he preferred to sign by a mark as it became increasingly difficult for him to write firmly and clearly. Ciro's English vocabulary was anything but extensive, but he spoke English frequently and intelligibly, comprehended when spoken to in that language, and was capable of expressing himself satisfactorily enough therein for his ordinary communication requirements. He was able to meet the requirements for obtaining citizenship and became naturalized. A decade or so before his death he used to go alone to his attorney, Mr. Sisson, who spoke only English, to consult on legal matters. On other occasions, Anna interpreted or translated for him during legal conferences or medical visits.

Despite his linguistic deficiencies, Ciro was able to main-

tain his job for 24 years. He also was able to acquire ownership, as of the date of the will here in question, of the home in which he resided, three other houses from which he obtained rents, and two additional parcels of real property which were then the subject of a condemnation proceeding. In 1942, Ciro had sold a parcel of property to the Goodwill Industries, at which time he signed his name to a deed in English. At the same time, he negotiated in English with the Philley Mortgage Company for procuring a check for the proceeds and then went to the California Bank where, speaking English, he had six cashier's checks for $250 each drawn to each of his then living children as payees (the transactions being a gift as to them).

For much of the time after he was widowed and his children married, Ciro lived mostly by himself. Anna lived across the street from him. For about three years prior to 1947, Ciro had his meals and slept in Anna's home, but passed the daytime hours in his own home. For three months in 1947 he stayed with Anthony. From 1947 until his death in 1950, he lived in his own home. During the last years of his life, Anna took care of him, prepared his meals, brought them to his house, washed, ironed and cleaned for him, and nursed him during illness. One witness testified that decedent told him in 1950 that "if it wouldn't have been for [Anna], . . . nobody would help him, nobody would come around to see him." Ciro spent much of his declining days at church, sometimes going four or five times a day. Anna seems to have been the mainstay in Ciro's later life and he reposed great trust in her. At his request she collected the rents from his properties and made out receipts for the tenants. When he asked her to, she withdrew funds for him from a bank account in their joint names in which Ciro's money only was deposited. Ciro himself never withdrew money from the account and Anna only when requested by her father. Upon his request, she cashed his pension checks and gave him the money. Ciro often provided her with money for the purpose of paying his bills in the latter years of his life.

### THE JOINT BANK ACCOUNT

The record shows that from at least as early as 1927, Ciro, his wife Frieda, and Anna together had a single bank account (No. 9482) with the California bank. On October 7, 1929, Ciro, Frieda and Anna executed an agreement to hold the above account in joint tenancy. Although Frieda died

in 1932, Anna and Ciro continued to maintain the account until May 6, 1937, when the remaining balance of $37.40 was withdrawn and the account became inactive. When Ciro sold some real property to the Goodwill Industries in 1942, he asked Anna to drive him to the Philley Mortgage Company, where he received a check for $3,033.99 representing the purchase price. He then asked Anna to take him to the California Bank to accomplish a negotiation of the check. While there he had six cashier's checks drawn in the amount of $250 as a gift for each of his children and issued one check for $265 to a contractor. Ciro at first desired to retain the balance of about $1,200 in cash. However, a bank officer suggested it was too much to keep in cash and Ciro agreed to deposit $1,000. He informed the bank officer opening the account that he wanted Anna to be named as a joint tenant with him. Thereupon another joint tenancy agreement card was executed by Ciro and Anna under date of April 11, 1942. The text of the agreement was similar to the one signed by Anna and Ciro in 1929 except for a clause relating to the bank's right of recovery against either signatory in the event of an overdraft. Anna testified she had no intimation that her father would create a new account in joint tenancy until the agreement was presented to her by Ciro and the bank officer for execution.

In July of 1948, Anna was a party to an escrow with the California Bank relative to property she was purchasing. She told Ciro about her deal and he told her she could use the funds from the joint account for the transaction. Thereupon Anna withdrew $1,625 from the account, bought a cashier's check and deposited it in escrow. On the same day, she reimbursed her father in full from cash which she had in her home. Her father placed the money in an envelope and took it home with him.

### The Role of Attorney Sisson

An understanding of the relationship between John Sisson, Anna's attorney of record herein, and Ciro and Anna is of significance in the resolution of this case. The first contact Sisson had with the decedent's family occurred in 1932, when Ciro's wife died and probate of her estate was necessary. Ciro employed Sisson for this purpose upon recommendation of an officer of the California Bank. In the same year, Ciro visited Sisson alone at his office and engaged him to draw the first of four wills. In 1943, when his son John

died, Ciro himself arranged for a second will to be drawn and went by himself to confer with Sisson in its preparation. On occasions Ciro went to Sisson's office alone and on others Anna accompanied him to interpret when difficult expressions were used. In later years Mr. Sisson called on Ciro whenever it was necessary to transact business, almost invariably when Ciro requested Anna to arrange an interview. In 1949, Sisson was engaged to draw a third will for Ciro after condemnation proceedings were instituted by the county of Los Angeles against two parcels of land owned by Ciro and one parcel in which Anna and Anthony each owned a one-half interest. Anna testified that after her father was served with notice of the condemnation suit, he asked her to telephone Sisson to request him to come by. When Sisson arrived, Ciro conversed with him and then engaged him to represent him in the condemnation matter. Anna stated that she thereupon asked Sisson to handle the proceedings involving the home she and Anthony owned. Sisson also prepared Anna's income tax returns and Anna visited his office a number of times after the condemnation actions were pending. When the condemnation matters were settled, Sisson was compensated individually by Ciro, Anthony and Anna out of their separate funds. Sisson also represented Anthony in a case involving a mechanic's lien. When a dispute arose between Anthony and Anna regarding the division of funds derived from the condemnation settlement, Anthony consulted Sisson, who advised him of his right to certain money and stated, "I don't know why she [Anna] is holding it from you." When Anthony sued Anna for this money, she employed Sisson to defend, and the matter was settled upon Anna's turning over to Anthony the amount due him after deduction of attorney's fees.

### The Execution of the Will and Deeds

Sometime prior to November 5, 1949, Ciro informed Anna that he wished to change his will and asked her to telephone Sisson. Ciro stated he was going to leave one dollar apiece to Joe and Lucy and Frieda and Colleen. He also told her he intended to deed two pieces of property to her "with the understanding that I was to meet his obligations, and if he needed money, or anything, it should come from there, and whatever was left, that he wanted me to have it." She testified he intended to deed property to Ross with the same understanding.

In accord with Ciro's request, Anna telephoned Sisson stating simply that her father desired a meeting with him. A few days later Sisson came to Anna's house where Ciro was waiting and spoke to him in private. Anna had no knowledge of what passed between them, although presumably directions for the contents of a new will and the grant deeds were given.[1]

Pursuant to arrangements between Ciro and Sisson, the latter arrived at Anna's home on November 5, 1949, with a form of proposed will and two grant deeds. Sisson's wife, Alyce, accompanied him. Ciro had also made arrangements with Mrs. Maria Cardillo, a long time friend of both Anna and himself, to be present at that time. After the conventional introductions and amenities, Anna left the room and remained in the garden until the transactions to be described were concluded. When Anna left, Ciro stated: "Now we fix the will." After identifying a copy of the will, Mrs. Sisson testified that Sisson read to Ciro in English each part of the will, pausing at frequent intervals to ask if he understood. On each occasion Ciro stated he understood both in English and Italian, employing such expressions as "O.K.," "bene" and "that's right," as well as by nodding his head. She stated that as the reading progressed, Mrs. Cardillo also explained each item read in Italian, Sisson telling her to be sure Ciro understood every word. Mrs. Sisson, a public school teacher who had studied Italian for four years, testified she identified the language used by Mrs. Cardillo as Italian. She testified that Ciro repeated in English "One dollar to Joe, that's right," and that he also stated: "One dollar to Joe and one dollar to Lucy and one dollar to each of the granddaughters." When Sisson read the clause dividing the residue between Anna, Anthony and Ross, Ciro declared, "That's right. That's Okay." When the paragraph naming Anna as administratrix was read to him, Ciro remarked that Anna had taken care of him for many years. In response to Sisson's question, "Do you declare this to be your last will and testament," Mrs. Sisson testified that Ciro stated, "Yes, I do." Mrs. Cardillo also testified that Ciro declared the document to be his will. She testified she explained its provisions in

---

[1]The court made an order excluding prospective witnesses from the courtroom. As Anna's attorney, Sisson was unable to comply with such order. When Sisson took the witness stand, appellants objected on the grounds of the court's ruling. The objection was sustained. Sisson was permitted to testify only as a subscribing witness to the will.

Italian as Sisson read in English and that Ciro said "Okay." Mrs. Cardillo heard Ciro comment that he wished to leave one dollar each to Lucia, Joe, Frieda and Colleen.

After the will was read, Ciro was asked whether he wished those present to act as witnesses. He said he did. Whereupon Ciro placed his mark on the will and Mr. and Mrs. Sisson and Mrs. Cardillo signed in the presence of each other. A copy of the will was left with Ciro. The witnesses testified that Ciro was of sound mind and was acting of his own free will.

As soon as the will was signed and witnessed the same parties, still the only ones in the room, turned their attention to the deeds. One deed contained a grant of two parcels of real property to Anna. The other was a grant of property to Ross. The procedure adopted with respect to the will was followed, Sisson reading in English and Mrs. Cardillo explaining his statements in Italian. As the property described in the respective deeds was referred to, Mrs. Sisson testified Ciro pointed in the direction of the location of the property. As he made his mark on the deed to Anna, she testified Ciro stated he wanted Anna to have the property because "she take good care of me. Good Anna take good care." In connection with the deed to Ross, Ciro stated, "That's for Ross, my son Ross. He been sick." Mrs. Cardillo also testified that Ciro stated, "The house on 19th [Avenue] for Ross." She testified Ciro said, with respect to the deed to Anna, "Okay, I want to give it to her and I did what I please. . . . In case I need it, I know my daughter give it to me. What I have got left, everything, that's hers." After Ciro had affixed his marks to the deeds and the witnesses had signed, Ciro handed them to Sisson saying, "You take. You take . . . Put them in the book." Ciro paid Sisson in cash for drawing the will and the deeds and obtained a receipt therefor.

After the Sissons left, Anna did not see the deeds. Her father told her that they were going to be recorded. The first sight of the deeds Anna had was when they reached her through the mail after having been recorded five days after execution. There was a notation on her deed, in Mr. Sisson's handwriting, that it was to be mailed to her after recording. After having executed the above conveyances, Ciro still owned the house in which he resided, real estate which was the subject of a condemnation suit, hidden cash in the amount of several thousand dollars, and a small joint tenancy bank account.

Anna testified that Ciro expressed to her his reasons for giving only one dollar to Joe, Lucy and his two grandchildren. As for Lucy, she had eloped and married a cousin against his will; she had maltreated her mother; and her derogatory gossip about Anna distressed him. Joe was cut off because several years before Ciro had loaned him $2,500 to buy a home, after which Joe borrowed $700 from a loan company to buy a car on the security of the house, thus impairing Ciro's security. Ciro protested to the loan company and requested they advance no more loans. Ciro subsequently paid off the loan on the property himself. With respect to Frieda Hanson, Ciro was displeased with her because she continually borrowed sums of money from him which were never repaid. Ciro stated he was disinheriting Colleen because her mother had divorced his deceased son John; that her mother had taken all John's money, and that both she and her mother had treated John and himself poorly.

## The Condemnation Suit Proceeds

In September, 1950, about 10 months after the execution of the will and deeds last described, Ciro was bedridden by what was to prove his mortal illness. The condemnation proceedings against property belonging to Ciro, Anna and Anthony had been pending since March, 1949, and negotiations for a settlement were being handled by Sisson. When the county offered a sum satisfactory to Ciro, he caused Anna to write Sisson signifying his acceptance, in August of 1950. Sisson personally delivered the three county warrants issued in settlement of the suits—one to Ciro in the amount of $8,875.79, one to Anthony for $2,247.77, and a third to Anna. Ciro's warrant was delivered to him on September 15, 1950, while he was ill in bed, one week before he died. Ciro was expecting this money, and was so pleased at its arrival that he sat up in bed to endorse the warrant the next day. Present on this occasion were Anna, Ross, Mrs. Cardillo and one Jose Roman. Ciro's hand shook as he was making his mark, so Anna laid her hand on top of his to steady it while he signed it himself. Mrs. Cardillo and Roman witnessed his signature, the former testifying Ciro was clearly aware that he was endorsing the condemnation check and that he was mentally sound. Ciro then handed the warrant to Anna and told her to deposit it in the bank, adding: "If I live I will use it and if I do not it is yours, God bless you." Mrs. Cardillo phrased Ciro's instruction as follows: "Put in bank,

any time I need you go get it and spend to me and God bless if I die and everything it is yours, and God bless you.'' On the sixteenth of September, Anna deposited the warrants endorsed by Ciro and Anthony in the joint tenancy account.[2] Ciro died on September 22, 1950, but the county warrants which had been credited to the account on September 16, 1950, were not actually paid until September 27, 1950.

## CIRO'S LIFE INSURANCE POLICY

Plaintiffs alleged that Anna had collected $750 on an insurance policy on Ciro's life which was to be used for his burial and funeral expenses. It was further alleged that Anna failed to use the proceeds for such purposes and had converted the funds. During the trial, Anna testified that she was the beneficiary of an insurance policy covering Ciro's life and had collected its proceeds. She was then asked by appellants' counsel, Mr. Gattone, whether there was any agreement with respect to that insurance. The court sustained an objection, stating: ''If you have a written contract, you certainly can't change it by oral terms and an implied agreement. If she was the beneficiary, that's it.'' Thereupon, Mr. Gattone made the following offer: ''We offer to prove at this time that this defendant collected $750 life insurance, which was made payable to her as beneficiary in trust, and for the uses and purposes that she would pay the decedent's burial and funeral expenses with those proceeds, and we further offer to prove that this defendant did not pay the burial and funeral expenses with those proceeds, but appropriated the funds to her own use.'' This offer was denied.

## THE FINDINGS

The court's findings, epitomized, are: that Ciro was of sound and disposing mind at the time he executed the will, there was no undue influence, and the will was executed as required by law; that the deed of November 5, 1949, conveyed good title to Anna, that Ciro executed said deed while fully competent, that said conveyance was not the result of undue influence or abuse of a confidential relationship on Anna's part, that in creating a joint tenancy bank account with Anna, Ciro fully understood its legal significance; that Ciro's endorsement of the county warrant was not procured by Anna through fraud, undue influence or exploitation of

---

[2] Anna returned the proceeds of Anthony's warrant in a settlement of the litigation filed by Anthony for its recovery.

either a confidential relationship or any incompetency of Ciro; that said warrant was deposited pursuant to Ciro's instruction; that Anna never appropriated to her own use any rents, issues, profits or retirement benefits belonging to Ciro, and that Anna is entitled to all monies in the joint account. The court found also that Anna received $750 as beneficiary of Ciro's life insurance, that it was not true that said insurance was for payment of Ciro's burial and funeral expenses and that Anna did not disburse any of those proceeds for such purposes.

## CIRO'S COMPETENCY

Although appellant's brief refers to testimony concerning Ciro's senility and emphasizes that while Ciro was returning alone from a trip to Louisiana about three years before his death he got off the train in confusion about 50 miles from Los Angeles, no serious or specific challenge is made of the finding that Ciro was mentally competent. Nor could such claim be legitimately advanced. ▪ Where unsoundness of mind is a ground of will contest, it is presumed that the testator was competent to execute the will and the burden rests on the contestant to prove affirmatively and by a preponderance of the evidence that the testator was of unsound mind at the time he executed the instrument. (*Estate of Perkins,* 195 Cal. 699, 703 [235 P. 45]; *Estate of Lingenfelter,* 38 Cal.2d 571 [241 P.2d 990].) Both Mrs. Sisson and Mrs. Cardillo testified that Ciro was of sound mind on November 5, 1949, the very time the will and the deeds were executed. ▪ This testimony indicated the rational behavior of decedent, showed that he was in possession of his faculties, and that he knew the extent of his property, its location, and the natural objects of his bounty. Such testimony of lay witnesses as to the mental condition of the testator at or about the time of the execution of the will, when accepted by the court, gives substantial support to the finding of competency. (*Estate of White,* 128 Cal.App.2d 659, 668 [276 P.2d 11].) A testator is of sound and disposing mind if, at the time of making his will, he has sufficient mental capacity to understand the nature of his testamentary act, to understand and recollect the nature and situation of his property, and to remember and understand his relations to the natural objects of his bounty whose interests are affected by the will. (*Estate of Lingenfelter, supra,* p. 582.) The record is replete with evidence that Ciro was fully cognizant of these factors.

█ As pointed out in *Estate of Shay*, 196 Cal. 355, 360 [237 P. 1079]: "The circumstance that the testator was uneducated and illiterate, unable to read handwriting and unable to write except to sign his name manifestly has no bearing upon his mental sanity or testamentary capacity."

## DUE EXECUTION OF THE WILL

In view of Ciro's limited knowledge of the English language, it is argued that the evidence failed to show due execution of the will or that Ciro had knowledge of its contents. The record thoroughly refutes this contention.

█ A will drawn in accordance with the intentions of the testator and executed in due form of law is valid even though written in a language not understood by the testator where it is shown he had full and accurate knowledge of its contents. (*In re Zych's Will*, 251 Wis. 108 [28 N.W.2d 316, 318] (testatrix spoke only Polish, did not speak or understand English); *In re Calo's Estate*, 1 Ill.2d 376 [115 N.E.2d 778] (testatrix of Italian descent, spoke some English, was blind at time will was executed, and signed by a mark); *Quaratiello v. Di Biasi*, 43 R.I. 325 [112 A. 215, 216] (interpreter used to convey contents of will to Italian testator); *In re Carmello's Estate*, 289 Pa. 554 [137 A. 734] (Italian testator with limited knowledge of English, signed by mark); *Hauer v. Hauer*, 44 S.D. 375 [184 N.W. 1]; (German testatrix neither spoke nor understood English); *In re Dybalski's Will*, 199 App.Div. 677 [191 N.Y.S. 809] (testatrix spoke and read only Polish); *In re Knutson's Estate*, 144 Minn. 111 [174 N.W. 617, 619]; Page on Wills (3d ed.) § 156, p. 315.) This rule, virtually universally followed, gives realistic consideration to the manner in which persons living in this country who are not conversant with our language would be expected to transact business of this nature. However, the case at bar represents a far less extreme application of the rule than the cases cited. Ciro often communicated in English, had previously executed three wills, and had on occasion discussed legal problems alone with Sisson. He alone gave Sisson instructions regarding the will, which were simple enough: payment of debts, appointment of an executrix, bequeathing of one dollar each to four persons, and division of the residue in equal shares among three children. There is no reason to believe Ciro could not express such ideas in the English at his command. Mr. Sisson identified the will admitted to probate as the one read to Ciro at the time of

its execution. That its contents were fully brought to Ciro's attention appears from the fact that he repeated statements read to him verbatim, and made comments showing he fully comprehended not only its substance, but its details, and that it was in accordance with his wishes. In view of the meticulous handling of the reading and translation of the will and Ciro's manifest understanding of its provisions, we entertain no doubt that it embodied his testamentary desires.

Appellants also contend that Ciro made no declaration that the document was his will and that he made no request to the subscribing witnesses to sign. This claim misconstrues the record and indicates that appellants misunderstand the law. ■ After Anna left the room, Ciro stated to all present, "Now we fix the will." After the will was read, Sisson asked: "Do you declare this to be your last will and testament?" Ciro nodded and answered, "Yes. Si." He also responded affirmatively to Sisson's question: "Do you wish us to sign as witnesses?" This evidence was sufficient to constitute a publication of the will and a request to sign on Ciro's part. (*Estate of Keizur*, 64 Cal.App.2d 117, 120 [148 P.2d 116]; *Estate of Offill*, 96 Cal.App. 640, 646 [274 P. 623].) ■ A testator need follow no particular form with respect to the request for attestation or the declaration that the instrument is his will and an express declaration and request are unnecessary if such are sufficiently indicated to the witnesses by the testator's conduct and actions. (*Estate of La Mont*, 39 Cal.2d 566, 569 [248 P.2d 1]; *Estate of Johnson*, 152 Cal. 778, 780 [93 P. 1015]; *Estate of Cullberg*, 169 Cal. 365, 368-369 [146 P. 888]; *Estate of Gray*, 89 Cal. App.2d 478, 484-485 [201 P.2d 392].) Under the circumstances appellants' argument that there was no translation of Sisson's questions as to whether the document was Ciro's will and whether he wished the witnesses to attest thereto, is mere quibbling. There was no need for such translation, as shown by Ciro's responsive affirmation to simple questions.

## No Undue Influence by Anna

■ The undue influence which justifies the setting aside of a will must be such as deprives the testator of his free agency, destroys the freedom of his purpose, and renders the testamentary instrument an expression of the will of another rather than his own; and it must operate at the time the will is made. (*Estate of Arnold*, 16 Cal.2d 573, 577 [107 P.2d 25]; *Estate of Higgins*, 156 Cal. 257, 262 [104 P. 6]; *Estate*

*of Llewellyn,* 83 Cal.App.2d 534, 561 [189 P.2d 822, 191 P.2d 419].) ▮ Where a beneficiary who unduly profits from a will occupies a confidential relationship towards the testator and *there is proof of activity on his part* in procuring the preparation or execution of the will, a rebuttable presumption of undue influence arises. (*Estate of White,* 128 Cal.App.2d 659 [276 P.2d 11], and the numerous cases there cited.) ▮ But the mere existence of a confidential relationship between the testator and beneficiary does not bring into play the presumption of undue influence where the beneficiary has not participated in the making of the will. (*Estate of Thompson,* 200 Cal. 410, 414 [253 P. 697]; *Estate of Arnold, supra; Estate of Fraser,* 75 Cal.App.2d 99, 104 [170 P.2d 704]; *Estate of White, supra.*)

While appellants have liberally sprinkled their brief with the narration of circumstances which might have supported a finding of undue influence, there is ample evidentiary support, even assuming a confidential relation, for the finding of no undue influence operating on the testamentary act and displacing the testator's free will. The record shows that Anna called Mr. Sisson *at Ciro's request* when he announced he wanted to change his will, and that Ciro and Sisson were closeted alone when Ciro gave his attorney his instructions. ▮ Securing an attorney designated by the testator at his request to draw a will does not constitute participation. (*Estate of Hull,* 63 Cal.App.2d 135, 142, 143 [146 P.2d 242].) ▮ ''The fact that the will was prepared from directions given by the testator to his attorney when no one else was present is very strong evidence that it was the testator's voluntary act. (*Estate of Unger,* 188 Cal. 714 [206 P. 1003]; 26 Cal.Jur. 728.)'' (*Estate of Fraser,* 75 Cal.App.2d 99, 104 [170 P.2d 704].) ▮ Furthermore, Anna was not even present when the will was executed, and the time, place and arrangements for witnesses were effected by Ciro himself. Additionally, the witnesses testified that at the time of the execution of the will Ciro was alert, of sound mind and aware of precisely what he was doing. Far from being at variance with decedent's testamentary intentions, as appellants claim, the will was exactly in accord with Ciro's intention as expressed to Anna, and corroborated by his expressions of approval as he heard the provisions read. The record is utterly barren of any evidence that Anna importuned Ciro or otherwise exerted any pressure on him either to make a will or to make one in favor of only three of the children.

Finally, not only is there no showing of activity on Anna's part but there is no indication that Anna profited unduly by the will. She is one of three children who share equally in the residue. While two children and two grandchildren are cut off, it cannot be said as a matter of law that the will as a whole was unnatural. There was evidence that Ciro bore certain grievances against these latter relatives and that he had resolved to omit them from his testamentary bounty. Where disposition of property is shown to have been consciously inspired by logical, if erroneous, reasons harbored in the mind of the testator, no inference is compelled that the decedent's volition did not accompany the testamentary act, simply because the will appears unjust to certain natural objects of his bounty. (*Estate of Williams,* 99 Cal.App. 2d 302 [221 P.2d 714].) The question of undue influence was one of fact and there was abundant evidence that the testament was the product of Ciro's uncontrolled will. The trial judge having reasonably found the evidence to weigh more heavily in Anna's favor, his finding may not be disturbed on appeal. (*Estate of White,* 128 Cal.App.2d 659, 670 [276 P.2d 11]; *Estate of Keizur,* 64 Cal.App.2d 117, 122 [148 P.2d 116].) In the language of *Estate of Lombardi,* 128 Cal.App.2d 606, 613-614 [276 P.2d 67], a case containing some interesting parallels to the matter before us: "Assuming . . . a presumption of undue influence was raised by the confidential relationship of the girls with their mother, and that the burden shifted, proponents have more than rebutted a prima facie case, by showing that under the family situation the provision was natural, that the instrument was not at variance with decedent's expressed testamentary intent, that testatrix had a mind of her own and was not subject to subversion of her will, and, most important, that the daughters were not active in procuring the will."

### Deed Passed Title to Anna

As has been recounted, immediately following execution of the will, Ciro signed two deeds conveying real property to Anna and to Ross. The deeds were prepared by Sisson following a private consultation with Ciro, and were executed, outside of Anna's presence, after being read to Ciro in English and Italian. Appellants urge that the deed to Anna should be voided because she has failed to overcome the presumption of undue influence emanating from her confidential relationship to Ciro. This argument is without merit in the

factual context confronting us. ▪ Assuming the existence of a relationship of trust and confidence between Anna and Ciro and that a presumption of invalidity attended the transaction (Civ. Code, § 2235), such presumption may be overcome where it is manifest that the grantor acted voluntarily and with full understanding, and that the benevolent act was engendered in the testator's own mind without overreaching or improper importunity on the part of the grantee. (*Goldman* v. *Goldman*, 116 Cal.App.2d 227, 234 [253 P.2d 474]; *Estate of Chamberlain*, 44 Cal.App.2d 193, 198 [112 P.2d 53, 934]; *Roeder* v. *Roeder*, 118 Cal.App.2d 572, 580 [258 P.2d 581].) ▪ Whether the donee has rebutted the presumption by showing the transaction was untainted by undue influence is a question for the trier of facts. (*Roeder* v. *Roeder, supra*, p. 580; *Azevedo* v. *Leavitt*, 76 Cal.App.2d 321, 324 [172 P.2d 704].) ▪ As stated in the Azevedo case, *supra*: "Before an appellate tribunal would be justified in reversing the finding of the trial court that there was no unfairness, fraud, or undue influence on the part of the donee, it must appear that there is no substantial evidence to support such finding." ▪ The evidence shows that Ciro, unsolicited and unprompted by anyone and purely of his own volition, conceived the idea of making a gift to Anna and proceeded to consummate all the details of the transaction unguided in any degree by Anna. When the deed was ready for execution, he pointed to the location of the properties and asserted that Anna had taken good care of him. There was other evidence that he appreciated the numerous, diverse, and onerous services Anna had rendered him for many years. In *Estate of Chamberlain, supra* (hearing den.), decedent was a paralytic, 86 years old and living with her son Perry at the time she gave him $1,500 and crops worth $1,453.18. At her death Perry's sister and half-brother contended these sums belonged to the estate. In allowing the gifts to stand, despite the existence of a confidential relationship, the court stated: "In disproof of any inference of imposition or undue influence, it is especially significant that the parent owed to the beneficiary a debt of gratitude for filial devotion and service and care during the parent's declining years." It is evident that any influence exercised by Anna over Ciro was merely that which a dutiful child impresses upon a parent by acts of filial responsibility, loyalty and obedience—clearly an unimpeachable and irreproachable type of influence. ▪ Influence acquired by means of acts of kindness and attention, good

offices and devoted ministrations is not undue if no deceit is practiced and the gift is the voluntary act of the donor. (*Kelly* v. *McCarthy*, 6 Cal.2d 347, 364 [57 P.2d 118] ; *Goldman* v. *Goldman, supra,* p. 235.) ██ It is perfectly natural for a parent to be more bountiful to one of his children who has assumed the greatest burden of care and lavished the highest degree of solicitude upon him. (*Walker* v. *Smith,* 58 Cal.App. 145, 151-152 [208 P. 157] ; *Carleton* v. *Bonham,* 60 Cal.App. 725, 740-741 [214 P. 503].) ██ The trial court was indubitably satisfied upon substantial evidence that Ciro was not imposed upon by Anna, that he was fully aware of the nature and effect of the transaction and that he wished Anna to have the property.

Appellants lay considerable emphasis on the fact that Ciro allegedly had no independent legal advice, apparently assuming that where a confidential relationship is present the absence of independent legal advice establishes fraud as a matter of law. But such is not the law. ██ The rule is correctly stated in *O'Neill* v. *Dennis,* 109 Cal.App.2d 210, 214 [240 P.2d 376] : "Lack of independent advice by the grantor is not of and in itself a ground for vitiating a deed under such circumstances [a confidential relationship] as we have here presented, but is a fact to be weighed by the trial court in determining whether the grantor acted voluntarily and with a complete understanding of the transaction. (*Brown* v. *Canadian Industrial Alcohol Co.,* 209 Cal. 596 [289 P. 613] ; *Laherty* v. *Connell, supra* [64 Cal.App.2d 355 (148 P.2d 895)] ; *Azevedo* v. *Leavitt, supra.*)'' However, it is not amiss to observe that contrary to appellants' observation, Sisson was qualified to give Ciro legal advice though he was representing Anna in the condemnation suit. The facts show that Ciro first employed him in his own condemnation proceeding, whereupon Anna likewise engaged him. Previously Sisson had done no work for Anna except for income tax service, while he had drawn three wills for Ciro and probated his wife's estate. He had also represented Anthony. In short, he was the lawyer for various members of the family and there is not the slightest intimation in the record that he consciously promoted the interests of one against another, or that he did anything but carry out Ciro's wishes in the matters here in dispute.

Appellants contend that the deed was never delivered to Anna because Sisson was not specifically instructed to deliver

the deed to Anna after recordation and Sisson had no authority to cause it to be mailed to Anna. However, the record shows that Ciro told Sisson to take the deeds and "put them in the book"; that after the meeting of November 5th, Ciro told Anna about the deeds and the fact that they were being recorded; and that at the time the deeds were executed Ciro told Mrs. Cardillo: "I want to give it to her and I did what I please." ▪▪▪ The validity of a properly executed deed of conveyance depends on its delivery by the grantor with the concomitant intent of transferring the property described therein to the grantee. (*Ogg* v. *Gunderson,* 74 Cal.App.2d 384, 387 [168 P.2d 793]; *Severn* v. *Ruhde,* 58 Cal.App.2d 704 [137 P.2d 466]; *Hansen* v. *Hansen,* 82 Cal.App. 786 [256 P. 290].) ▪▪▪ If at the time he parts with possession of a deed the grantor intends to divest himself of title to the property conveyed, there is an effective delivery of the deed passing title irrevocably to the grantee. (*Williams* v. *Kidd,* 170 Cal. 631, 638-639 [151 P. 1, Ann.Cas. 1916E 703]; *Security-First Nat. Bank* v. *Leatart,* 75 Cal.App.2d 211, 214-215 [170 P.2d 687]; *Ogg* v. *Gunderson, supra.*) ▪▪▪ The solution of the question of whether an effective delivery took place in the circumstances here shown is grounded entirely on the intention of the grantor, which is a question of fact to be determined by the trial court on all the pertinent evidence. (*Williams* v. *Kidd, supra; Security-First Nat. Bank* v. *Leatart, supra.*) The evidence and the inferences properly drawn therefrom fully support the finding that at the time he handed Sisson the conveyance to Anna he intended to make a presently-operative transfer of title to her. There is no evidence that Ciro intended to retain dominion over the legal title after surrendering the deeds. There is likewise no merit in the assertion that the deed must fail because Sisson did not explain the legal effect of a deed to Ciro. The evidence is clear that Ciro understood he was parting with title in executing the respective deeds to Anna and Ross. Furthermore, these deeds were not the first that Ciro executed. In 1942, he had signed a deed conveying property to Goodwill Industries and in that same year he had executed a deed by which he conveyed property to Anna and Anthony as tenants in common.

It is also argued that assuming a valid conveyance, the court erred in not finding that Anna held the property in trust for Ciro. Appellants quote testimony by Anna that Ciro told her he was going to convey the property to her

"with the understanding that I was to meet his obligations, and if he needed any money, or anything, it should come from there, and whatever was left, that he wanted me to have it." Other testimony from Anna was to the effect that it was understood that if Ciro ever needed money for church contributions, or for clothing, or to sustain him in any way before he died, Anna would give it to him from the property.[3] Appellants therefore contend that even though the deed to Anna is absolute in form, the evidence compels the conclusion that Anna held the property as trustee for Ciro. We do not agree. ▮ It is settled that when a trial court has declared a deed to be exactly what it purports to be, an appellant cannot expect a reversal of such determination "unless the evidence is almost overwhelming the other way." (*Lombardi* v. *Tranchina*, 129 Cal.App.2d 778, 780 [277 P.2d 938]; *Spaulding* v. *Jones*, 117 Cal.App.2d 541, 548 [256 P.2d 637].) ▮ In the case at bar, Anna promised orally that she would take care of Ciro's obligations and living expenses in the event his own resources proved inadequate for such purposes. Such promise is most reasonably construed as a mere personal covenant, for the breach of which a cause of action for damages would lie. (*Lavely* v. *Nonemaker*, 212 Cal. 380, 384-385 [298 P. 976], followed in *Ampuero* v. *Luce*, 68 Cal.App.2d 811 [157 P.2d 899]. In the Ampuero case, the grantor stated (pp. 815-816): "I am deeding this property to you . . . and John with the understanding you are supposed to take care of him [grantor's husband] when he needs any money or care, you are supposed to help him out"—language analogous to Ciro's). At most, had Anna failed to adhere to her promise, a finding might have been justified that Anna held the property subject to an equitable charge to the extent Ciro required assistance for his livelihood—a liability clearly distinct from that of a trust. (*Woodley* v. *Woodley*, 47 Cal.App.2d 188, 191 [117 P.2d 722].) There is nothing in the record to indicate that Ciro ever required financial assistance or that Anna refused him the necessities of life or any other filial obligation she was called upon to provide. In any event, whether Anna's promise is construed as a personal covenant or an equitable charge on the property to guarantee performance of the obligation, it is clear that no trust was created and the court

---

[3]There was testimony that such an understanding was also reached between Ciro and Ross, the grantee of the other conveyance.

properly concluded that Anna held title unencumbered by any claims of appellants.

## ANNA ENTITLED TO JOINT ACCOUNT

Appellants argue that Anna has failed to overcome the presumption of undue influence with respect to the opening of the joint tenancy account and assert there is no showing that Ciro appreciated its legal significance. This argument is tenable only by appellants' persistent discounting of facts and inferences which dispel the presumption and by their tenacious emphasis on implications favorable to their claim. However, the evidence shows that Ciro, his wife, and Anna were joint tenants of a bank account as early as 1927. When the new account was opened in 1942, in favor of Ciro and Anna, it was Ciro who suggested to a bank officer that he wanted Anna as a joint tenant. Anna did not participate in the transaction except to the extent of driving her father to the bank at his request to secure several cashier's checks. The deposit of the funds in the bank in the first instance was done upon the advice of a bank officer. From these circumstances, it is clear that Anna did not procure the opening of the joint account. That Ciro fully comprehended the legal incidents of a joint tenancy account appears from his statement to Anna when he directed her to deposit his condemnation warrant in the bank: "If I live I will use it and if I do not it is yours, God bless you." The inference is plainly deducible that Ciro recognized that his death would transfer title to the funds to Anna by operation of law.

Appellants urge that Anna should be charged with $1,625 drawn from the bank account in 1948 for her personal use. Anna testified she withdrew no funds except at the request, or with the permission, of her father. She explained her withdrawal of the above sum as occasioned by her involvement in a real estate escrow. With Ciro's permission she withdrew the money and bought a cashier's check which she deposited in escrow. She reimbursed her father with money she had at home. The trial court, whose function it was to evaluate the testimony, believed Anna's account of the transaction. It was not inherently improbable, as appellants contend. It is further borne out by the fact that when he died Ciro had several thousand dollars hidden in his home.

## PROCEEDS OF COUNTY WARRANT

Appellants urge that the court erred in not rendering judgment against Anna for the proceeds of the county war-

rant ($8,875.79) deposited in the joint account, contending first that its deposit was procured through Anna's undue influence. The evidence fully sustains the court's determination that no such influence existed in that connection. Ciro was waiting for the warrant and sat up in bed to endorse it; his endorsement was made freely in the presence of Mrs. Cardillo, Jose Ramon, Ross Camperi and Anna; he himself directed Anna to deposit the warrant; and his comment that he would use it if he lived but the money would be Anna's if he died, established that he had a precise understanding of the transaction.

Appellants' alternate contention is that inasmuch as Ciro died prior to the payment of the warrant, the proceeds thereof were rightfully subject to probate as a part of Ciro's estate. This argument rests on the following chronology: The warrant was deposited on September 16, 1950; the joint account was credited therewith on the same day; Ciro died on September 22d; the county paid the bank as holder of the warrant on September 27th. Premising their argument on the erroneous assertion that the bank was merely Ciro's agent to receive payment of the warrant from the county, appellants contend that Ciro's death before payment revoked the bank's agency, citing Civil Code, section 2356.[4] This argument is specious, since no principal-agency relationship ever came to pass. The deposit of the warrant was not for collection, but was made without condition, qualification or restriction. A county warrant may be transferred by the payee by assignment. (*Beals* v. *Evans*, 10 Cal. 459; *Dana* v. *City & County of San Francisco*, 19 Cal. 486, 491.) When the warrant was endorsed and deposited in the bank and the joint account given full credit therefor, the relationship subsisting between the bank and the joint depositors was not that of principal and agent but one of creditor and debtor. (*Newmark Grain Co.* v. *Merchants Nat. Bank*, 166 Cal. 203, 208 [135 P. 958]; *Metropolitan Life Ins. Co.* v. *San Francisco Bank*, 58 Cal.App.2d 528, 534 [136 P.2d 853]; *Plumas County Bank* v. *Bank of Rideout, Smith & Co.*, 165 Cal. 126, 137-139 [131 P. 360, 47 L.R.A.N.S. 552].) When the bank received the warrant and placed the amount thereof to the credit of the account, it succeeded to Ciro's right to receive

---

[4]Civil Code, section 2356, reads: "Unless the power of an agent is coupled with an interest in the subject of the agency, it is terminated by: (1) Its revocation by the principal; (2) his death; or, (3) his incapacity to contract; . . ."

payment thereon and the warrant itself was no longer subject to Ciro's control. His subsequent death did not affect the bank's right, since as assignee or subrogee of Ciro's rights under the warrant to receive the moneys it was not an agent and section 2356 of the Civil Code does not apply. The fact that under section 1011 of the Financial Code the credit allowed by a bank on a deposit other than cash is provisional until ultimate payment is received does not convert the creditor-debtor relationship between the bank and depositor into one of principal and agent. (*Plumas County Bank* v. *Bank of Rideout, Smith & Co., supra,* p. 136; *Gonyer* v. *Williams,* 168 Cal. 452, 454 [143 P. 736].) The cases cited by appellants stand for the propositions (1) that a plaintiff cannot sue the county upon a warrant without showing an assignment to him, and (2) that a warrant is not a negotiable instrument which an assignee may take free of defenses against the payee. Neither of these rules is here pertinent—the warrant was duly assigned to the bank, and no action is being brought against the county which, in fact, has paid it in accordance with its terms.

### PAROL EVIDENCE IMPROPERLY EXCLUDED

 As beneficiary of Ciro's life insurance, Anna collected $750 from the insurer. The court found that it was not true that "the object or purpose of said life insurance was . . . to provide for payment of burial and funeral expenses of Ciro Camperi." During the trial the court sustained an objection to the introduction of oral evidence by appellants regarding an understanding under which these proceeds were payable to Anna. Appellants' offer to prove that Anna agreed to receive these proceeds in trust and to use them to pay Ciro's funeral and burial expenses was refused, the learned trial judge stating: "If you have a written contract, you certainly can't change it by oral terms and an implied agreement. If she was the beneficiary, that's it." This was error. It is well settled that trusts in personalty may be created orally and may be established by parol evidence. (*Chard* v. *O'Connell,* 7 Cal.2d 663, 665 [62 P.2d 369]; *Lefrooth* v. *Prentice,* 202 Cal. 215, 227 [259 P. 947]; *Silvey* v. *Hodgdon,* 52 Cal. 363, 368; Anno. 102 A.L.R. 588.) The Silvey case, *supra,* is directly pertinent. There, defendant and the insured, her father, agreed orally that if the father procured insurance on his life, made payable to defendant, she would hold the proceeds in trust for the benefit of the other minor children. Defendant collected the amount of the

policy, but repudiated her trust. The court below permitted proof of an oral trust in the proceeds of the policy. The Supreme Court affirmed, rejected the objection that such evidence contradicted the written policy and held that proof of an oral trust in no way affected the rights or obligations of the insurance company. The court stated: ''It is true that a contract between Anthony [the father] and [defendant] Susan M., alone, could not affect the rights of the insurance company. The contract did not purport to affect the rights of the company. In this view it may be assumed that the company might refuse to pay the amount of the policy to any other person than Susan M. Hodgdon. The contract found by the court below to have been made by Anthony Silvey and defendant Susan M., in no way added to nor varied the tenor or conditions of the written contract between the insurer and the assured, but simply imposed on the latter [sic] an obligation in respect to the moneys which should come to her hands when the agreement of insurance should be fully executed. We can discover no good reason why the parol trust should not be enforced.''

It follows that it was prejudicial error to refuse to admit testimony germane to the issue of the character of Anna's title to the insurance funds, whether upon a trust or as an outright beneficiary.

It would entail a fruitless prolongation of this opinion to discuss other items of evidence which create either a conflict in the testimony or resolve themselves into a matter of credibility of witnesses. An example of this is appellants' frequent reiteration that Mrs. Cardillo testified she was a loyal friend of Anna, with the implication that her testimony should be discounted. However, she also testified she was a devoted friend of Ciro, and her reliability as a witness was in no substantial wise impaired. Be that as it may, it was for the trial court to appraise Mrs. Cardillo's testimony and evaluate the weight to be accorded it, and in this as well as in other disputed areas, we may not arrogate to ourselves the fact finding functions of the trial judge.

The judgment in Case No. 604316 below (No. 20321 on appeal) is reversed with directions to retry only the issue of the beneficial ownership of the proceeds of Ciro's life insurance policy; in all other respects this judgment is affirmed.

The judgment in case No. 310950 below (No. 20322 on appeal) denying revocation of the probate of the will is affirmed.

Appellants shall bear ninety (90) per cent of the costs of the consolidated appeal and respondents ten (10) per cent thereof.

Moore, P. J., and McComb, J., concurred.

A petition for a rehearing was denied August 11, 1955, and appellants' petition for a hearing by the Supreme Court was denied September 15, 1955.